AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT **FILED**

for the

Eastern District of California

JUL 24 2017

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
DEPUTY CLERK

|                                              |   |
|----------------------------------------------|---|
| In the Matter of the Search of               | ) |
|                                              | ) |
| 2860 Central Avenue, Roseville, California   | ) |
|                                              | ) |
|                                              | ) |

Case No. 2:17 - SW - 0 6 6 0   **CKD**

SEALED

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

located in the _____ Eastern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|----------------|------------------------|
|                |                        |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

☑ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Alicia Ramirez, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7/24/2017

*Judge's signature*

City and state:   Sacramento, California

Carolyn K. Delaney, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT OF DEA SPECIAL AGENT ALICIA RAMIREZ IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

I, Alicia Ramirez, being first duly sworn, hereby depose and state as follows:

## Scope of Requested Search Warrants

1.   I make this affidavit in support of applications for search warrants of eight properties located in the greater Sacramento, California, area.  The properties are identified as:

## Places (Attachment A-1 through A-9)

a.   7810 Elsie Avenue, Sacramento, California, which is referred to hereafter as "Target Property 1" and is further described in Attachment A-1;

b.   8638 Bradshaw Road, Elk Grove, California, which is referred to hereafter as "Target Property 2" and is further described in Attachment A-2;

c.   2860 Central Avenue, Roseville, California, which is referred to hereafter as "Target Property 3" and is further described in Attachment A-3;

d.   10315 Baseline Road, Elverta, California, which is referred to hereafter as "Target "Property 4" and is further described in Attachment A-4;

e.   8967 Sonoma Valley Way, Sacramento, California, which is referred to hereafter as "Target Property 5" and is further described in Attachment A-5;

f.   4849 Ammolite Way, Elk Grove, California, which is referred to hereafter as "Target Property 6" and is further described in Attachment A-6;

g.   8114 Suarez Way, Elk Grove, California, which is referred to hereafter as "Target Property 7" and is further described in Attachment A-7;

h.   3433 La Cadena Way, Sacramento, California, which is referred to hereafter as "Target Property 8" and is further described in Attachment A-8;

i.   2725 52ND Ave, Sacramento, California, which is referred to hereafter as "Target Property 9" and is further described in Attachment A-9;

## SAFE DEPOSIT BOX Attachment A-10

j.   The safe deposit box is further identified as JP Morgan Chase Bank safety deposit box 810304 , in the name of Yong Jie LIU (hereinafter Y. LIU), located at the JP Morgan Chase Bank branch located at 4450 Florin Road, Sacramento, California.

## VEHICLES Attachment A-11 through A-13

k.   2003 Honda Odyssey (CA License #7RAJ323), registered to WEI, Dao Zhong 5656 Ehrhardt Avenue, Sacramento, CA; vehicle driven by WEI,  and Gui Wen PAN. (Attachment A-11)

l.   2008 Infiniti (CA License #7RAJ324), registered to WEI, Dao Zhong 5656 Ehrhardt
Avenue, Sacramento, CA; vehicle driven by Xiu Ping LI. (Attachment A-12)

m.  2013 Honda Odyssey (CA License #7WZA583 VIN 5FNRL5H67DB059073) registered
to LIU, Yongjie, 5656 Ehrhardt Avenue, Sacramento, California. Previously same VIN,
was bearing Louisiana license #XJS712, registered to LIU, Yongjie and LI, Zutao, 417
Cherokee Lane, Lafayette, Louisiana; vehicle driven by Y. LIU. (Attachment A-13)

2.   (These properties are referred to collectively as the "Target Properties"
Attachments A-1 through A-9, a safe deposit box attachment A-10, and vehicles attachment A-
11 through A-13 are attached hereto and incorporated by reference.)

3.   The Target Properties, safe deposit box and vehicles are believed to be connected
to a Drug Trafficking Organization's (DTO) marijuana cultivation and distribution activities,
and I request search warrants for each property, safe deposit box and vehicles.

4.   Because this affidavit is being submitted for the limited purpose of securing search
warrants for the Target Properties listed above, I have not included each and every fact known
to me concerning this investigation. I have set forth only the facts that I believe establish
probable cause that evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841
(a)(1) (Manufacture of Marijuana), 846 (Conspiracy to Manufacture Marijuana), 856
(Maintaining a Place for the Manufacture and Distribution of Marijuana), 18, U.S.C. §
1956(a)(2)(A) (Money Laundering), 18 U.S.C. § 1956(h) (Conspiracy to Launder Money) and
18 U.S.C. § 1957 (Monetary Transaction in excess of $10,000 in Specified Unlawful Activity
proceeds) will be found at the locations to be searched.

**Relevant Statutes**

5.   Pursuant to Title 21, U.S.C. § 841(a)(1), it is unlawful for any person knowingly or
intentionally to manufacture, distribute or dispense, or possess with intent to manufacture,
distribute, or dispense, a controlled substance. Pursuant to Title 21, U.S.C. § 846, it is unlawful
to conspire to commit a violation of Title 21, U.S.C. § 841(a)(1). Both of these violations are
felonies punishable by more than one year's imprisonment.

6.   Pursuant to Title 21, U.S.C. § 856, it is unlawful to knowingly open, lease, rent, use
or maintain any place, whether permanently or temporarily, for the purpose of manufacturing,
distributing, or using any controlled substance. It is also unlawful to manage or control any
place, whether permanently or temporarily, either as an owner, lessee, agent, employee,
occupant, or mortgagee, and knowingly and intentionally rent, lease, profit from, or make
available for use, with or without compensation, the place for the purpose of manufacturing,
storing, distributing, or using a controlled substance. This violation is a felony punishable by
more than one year's imprisonment.

7.   Pursuant to Title 21, U.S.C. § 881(a)(7), all real property, including any right, title
and interest in the whole of any lot or tract of land and any appurtenances or improvements,
which is used, or intended to be used in any manner or part, to commit, or to facilitate the

commission of a violation of Title 21 which is punishable by more than one year's imprisonment, is subject to forfeiture to the United States.

8. Pursuant to Title 18, U.S.C. § 1956(a)(2)(A), whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place outside of the United States to or through a place inside the United States with the intent to promote the carrying on of specified unlawful activity shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer whichever is greater, or imprisonment for not more than twenty years, or both. Under Title 18, U.S.C. § 1956(h), it is a crime to conspire to commit a violation of Title 18, U.S.C. § 1956(a)(2)(A).1

9. Pursuant to Title 18, U.S.C. § 1957 (a) (d) whoever knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity shall be subject to imprisonment up to ten years.

10. Pursuant to Title 18, U.S.C. § 981(a)(1), any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of Title 18, United States Code, or any property traceable to such property, is subject to forfeiture to the United States.

## **Training and Experience**

11. I am a Special Agent of the Drug Enforcement Administration (DEA) and have been so employed since August 1987. I am currently assigned to the DEA Sacramento District Office charged with investigating major drug trafficking organizations operating in the Eastern District of California, and elsewhere. As a DEA agent, I have assisted in the execution of search warrants on many occasions for controlled substances and/or related paraphernalia, indicia, and other evidence of violations of federal drug statutes. I have participated in investigations targeting individuals and organizations trafficking heroin, cocaine, marijuana, methamphetamine, and other controlled substances, as defined in Title 21, United States Code, Section 801.

## **Background on drug trafficking – specifically growing marijuana**

12. I have been involved in several investigations targeting drug trafficking organizations who are cultivating marijuana in residential properties in the Sacramento, California area. These residential properties are typically converted into full-scale indoor marijuana gardens that pose serious hazardous conditions to the occupants of the residences as well as nearby properties and residents. It is common for marijuana cultivators to conduct the loading and unloading of marijuana and cultivation equipment inside closed garages in order to conceal their illegal activity. I am aware furthermore that marijuana cultivators commonly use

---

[1] It should be noted that for purposes of this section of the money laundering statute, funds transferred to a place in the United States from or through a place outside the United States need not be proceeds of a specified unlawful activity (*United States v. Moreland*, 622 F.3d 1147, 1166-67 (9th Cir. 2010); *United States v. Cornelio-Legarda*, 381 Fed. Appx. 835, 841-42 (10th Cir. 2010)).

large industrial type ventilation systems in their marijuana gardens which is consist of large conical carbon air filters, high-power industrial type electrical fans, large ducting, other equipment for the purpose of providing fresh air for the marijuana plants and to ventilate the marijuana odor to lessen the risk of being detected and discovered by authorities. Although typical marijuana grow house has all the windows tightly closed, these ventilations systems require an open window during the times of their operation in order to forcefully suck fresh air into the residence. The open window(s) usually have visible debris stuck to the window screens.

13. I know that, within the context of a marijuana investigation, marijuana grows inside residences can also be identified by odd power usage patterns such as: (a) unusual usage that is meant to mimic a day/night cycle to promote growth in plants; (b) extremely low or extremely high usage in the absence of a reasonable explanation; (c) low gas usage consistent with an unoccupied residence even though power is being consumed at the same residence; this suggests that cultivation equipment is running at all hours of the day.

14. Based on my training and experience, including my participation in this and other investigations involving financial crimes and the distribution of illicit drugs, and based upon my consultation with other experienced law enforcement agents and officers, including other DEA special agents, I know that:

15. Drug traffickers often possess, manufacture, and/or store illegal drugs, including marijuana, in their residences, stash-houses, or businesses – to include garages, barns, sheds, and other outbuildings – where they are concealed from law enforcement officials and readily at hand. Drug traffickers also often use their personal vehicles to temporarily store and transport illegal drugs. Furthermore, it is common for drug traffickers to maintain hidden compartments, items altered for the purpose of hiding or concealing drugs, and items purchased and converted for the use of storing their drugs in these same locations.

16. Unlike some illegal drugs, which originate overseas and require little or no domestic manufacturing, marijuana is grown and processed in the United States. Manufacturing marijuana involves typical gardening supplies and equipment, such as soil, fertilizer, nutrients, nursery pots, and trimming shears, as well as more specialized supplies and equipment, such as high intensity lights, ballast, fans, filters, generators, PVC pipes, growing trays, and reservoirs. It is common for drug traffickers to maintain such equipment and supplies in their residences, stash-houses, or businesses where they are concealed from law enforcement officials and where they may be easily utilized.

17. Illegal drugs, including marijuana, are frequently transported into the United States and between cities within the United States in bulk, high-purity form, and drug traffickers attempt to mask the distinct odors of particular drugs during such transport through the use of heat sealing and/or canning devices and/or aromatic substances such as laundry soap, dryer sheets, air fresheners, or axle grease. Furthermore, illicit drugs are often repackaged in smaller quantities so they can be sold for a higher profit margin. This typically requires masking agents, scales, tape, heat-sealers and heat-sealed bags, zip-loc bags, turkey bags, paper or plastic bindles, gel capsules, and/or other materials and containers which are used for redistribution. These packaging supplies and equipment are oftentimes maintained by drug traffickers in their

4

residences, stash-houses, or businesses, where they are concealed from law enforcement officials and where they may be easily utilized.

18. It is common for drug traffickers to maintain books, receipts, purchase orders, notes, ledgers, notebooks, and other forms of records specifically relating to their drug distribution activities in order to account for the transportation, ordering, purchase, manufacturing and distribution of their illegal drugs and the remittance of drug proceeds. Moreover, because drug traffickers will often "front" (that is, sell on consignment) controlled substances to their clients or will be "fronted" (that is, buy on credit) controlled substances from their suppliers, such documentation is necessary to keep track of the amount of drugs bought and sold and the amount of money paid and owed with respect to their customers and suppliers. These ledgers are more commonly known as "pay/owe" sheets and may be as simple as notations on miscellaneous pieces of paper or may be recorded more formally in notebooks or even computer software programs. Such records, which are frequently cryptic or encoded in order to protect those who are involved in the distribution activities, will often be maintained by drug traffickers on their persons or in their residences, stash-houses, businesses, and/or vehicles so they are close at hand and readily available for the purposes of ascertaining current balances.

19. Drug traffickers frequently maintain listings of names, aliases, telephone numbers, pager numbers, facsimile numbers, physical addresses, and email addresses, sometimes encoded and sometimes not encoded, for the purpose of contacting their suppliers, customers, transporters, and others involved in their illicit drug distribution activities, and these records are typically maintained on their persons or in their residences, stash-houses, businesses, and/or vehicles, so they are readily available in order to efficiently conduct their drug trafficking business.   Moreover, such records are often stored electronically within the memory of telephones, pagers, computers, and/or personal digital assistants such as i-Phones, Palm, and Blackberry devices.

20. Drug traffickers often use the United States Postal Service or commercial express mail delivery companies, such as FedEx or UPS, to ship illegal drugs and money to various points within the United States.  They do so, at least in part, due to the convenience of the service and the availability of related internet and phone tracking services speed of delivery, and to reduce their risk of arrest during the transportation of drugs from one place to another. They often use hand-written air bills, drop the packages near closing time, pay for such services in cash and utilize false or nominee names, addresses, and/or telephone numbers when using such services in order to further insulate themselves from detection by law enforcement.  Drug traffickers frequently maintain records relating to their use of these services, such as receipts, copies of airbills, empty and/or previously used boxes, packing tape, packing popcorn/filler and other packaging materials, and package tracking records printed from the internet, at their residences, stash-houses, businesses, and/or in their vehicles, where they are available for reference.

21. Drug traffickers commonly store their illicit drug inventory and any drug-use paraphernalia, to include pipes, syringes, and rolling papers, in their residences, stash-houses, businesses, and/or vehicles in order that they may have ready access to the drugs and/or

paraphernalia in order to conduct their drug trafficking business or to use those drugs personally, and so that such items are concealed from law enforcement officials.

22. During the course of a search, law enforcement often seize articles of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises and/or vehicle, such as cancelled mail, deeds, leases, titles, registration information, rental agreements, photographs, videos, diaries, utility and telephone bills, tax documentation, travel documents, statements, passports, driver's licenses and/or identification cards, immigration documentation, birth certificates, and keys.

23. Those involved in the distribution of illicit drugs often travel by car, bus, train, or airplane, both domestically and to and/or within foreign countries, in connection with their illegal activities in order to meet with coconspirators, conduct drug transactions, or to transport drugs or drug proceeds. Documents relating to such travel, such as calendars, travel itineraries, maps, airline ticket and baggage stubs, frequent-use club membership information and records associated with airlines, rental car companies, and/or hotels, airline, hotel and rental car receipts, credit card bills and receipts, photographs, videos, passports, and visas, are often maintained by drug traffickers in their residences, stash-houses, businesses, and/or vehicles, where they are readily available for use or reference.

24. Drug traffickers frequently utilize cellular telephones, satellite telephones, pagers and text-messaging devices, voicemail or answering machine systems, telephone calling cards, computers, email, and/or personal digital assistants such as I-Phones, Palm, and Blackberry devices in order to communicate with their suppliers, customers, transporters, and others involved in their illicit drug distribution activities, and these items, along with corresponding purchase, service, and billing records, are often maintained on their persons or in their residences, stash-houses, businesses, and/or vehicles, where they are readily available. Further, drug traffickers often utilize two-way radios, police scanners, video surveillance systems, and other counter-surveillance equipment to prevent detection by law enforcement, and such items are typically maintained at their residences, stash-houses, businesses, and/or in their vehicles.

25. Drug traffickers frequently possess firearms, ammunition, magazines, holsters, silencers, receipts for the purchase of repair of firearms, carrying cases and firearm boxes, explosives, incendiary devices, and other dangerous weapons, to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take such items and/or harm them during transactions. Such weapons, which are oftentimes stolen or otherwise possessed illegally, are typically maintained on their persons or in their residences, stash-houses, businesses, and/or vehicles, where they are concealed from law enforcement and readily available.

26. Drug traffickers frequently take, or cause to be taken, photographs and/or videos (which may be stored as CDs or DVDs or other electronic media) of themselves, their criminal associates, their assets (including real and personal property), their weapons, and their drugs, and such items are typically maintained on their persons, in their residences, businesses, and/or vehicles.

**Background on money laundering in relation to drug trafficking**

27. Illegal drugs, including marijuana, are typically bought and sold in exchange for cash, and it is common for drug traffickers to conceal large sums of currency, precious metals, jewelry, wire transfer receipts, cashier checks, money orders and receipts, and other financial instruments or items of value which either represent the proceeds from drug sales or are intended for the purchase of controlled substances, including documentation relating to the purchase of real estate, businesses, and motor vehicles. When drug traffickers amass such wealth, they often attempt to legitimize that wealth or otherwise conceal it and its origin from discovery by law enforcement. Collectively, the methods used by drug traffickers to conceal the source of and utilize their illicit income are called money laundering. For example, money laundering methods include using the proceeds from the illicit activity in order to conduct cash transactions in amounts less than $10,000.01 with the purpose of avoiding currency reporting requirements or in order to purchase items which, in turn, are used to promote the ongoing illicit activity. Money launderers also oftentimes utilize businesses as "fronts" in an attempt to legitimize and conceal their activities, and use aliases and nominees to conceal assets and financial activity.

28. In the course of laundering their illicit proceeds, drug traffickers often utilize foreign and domestic banks and their attendant services, to include savings and checking accounts, securities, cashier's checks, money drafts, letters of credit, safe deposit boxes, and the purchase of real estate or vehicles; other financial services or money services businesses, to include insurance and investment companies, the United States Postal Service, and money remitting services; and business services for the establishment of shell corporations, business fronts, and post office boxes. They typically keep records of such activity, including accounting books, records, receipts, bank statements and records (of both domestic and foreign banks), money drafts, letters of credit, money order and/or cashier's check receipts, wire transfers, passbooks, bank checks, letters of credit, and tax returns for long periods of time.

29. Also, drug traffickers often utilize fictitious or "strawholder" owners to conceal the true ownership and illegal source of real property, vehicles, or other valuable items purchased with the proceeds of illicit drug sales. In addition, drug traffickers often make use of wire transfers, cashier's checks, and money orders to pay for controlled substances or make remittance for other costs relating to the distribution of illicit drugs or in their efforts to launder the proceeds from such activities. The courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, the trafficking of controlled substances.

30. Those involved in the distribution of drugs typically maintain currency and money counters, precious metals, jewelry, wire transfers, cashiers' checks, money orders, and other financial instruments, as well as records or other evidence relating to financial transactions, income, banking, and expenditures of money and wealth in connection with drug trafficking on their persons or in their residences, stash-houses, businesses, and/or vehicles, where they are concealed from law enforcement and readily available.

31. Furthermore, I know that it is common for drug traffickers to hide drugs, currency and other valuable items representing the proceeds of drug sales or intended for use to purchase drugs, and/or records of drug transactions, drug sources, and drug customers in secure locations

within their residences, stash-houses, businesses, and/or vehicles in order to prevent the theft of such items by other persons or the seizure of such items by law enforcement. These secure locations typically include safes, portable safes, vaults, or other locked containers, as well as specially-constructed concealed compartments such as those often found in "load cars" used specifically to facilitate drug trafficking. Other methods of concealment include the burial of such items underground, the use of locked vehicles, trailers, detached garages and other out-buildings, sheds, and/or exterior closets, the use of specially-constructed or natural spaces within walls, furniture, vehicles, and other areas, and the use of sealed cans and canning machines.

32. And finally, I know from my training and experience that those involved in ongoing, long-term conspiracies to distribute illegal drugs often maintain the types of items described above in their residences, stash-houses, businesses, and/or in their vehicles on an ongoing, long-term basis so as to facilitate the conspiracy and prevent detection.

33. Persons involved in money laundering in particular also oftentimes maintain records of their financial activity, such as receipts for expenditures by cash and check and other financial instruments, business records, bank records, tax returns, escrow files and other financial documents, in their personal residences, place of business, rented storage units, vehicles, or other places under their control. These records may be in the form of written notes and correspondence, receipts, negotiated instruments, contracts, invoices, bank records, tax documents and other records. Records of this kind are also often stored on computer media. Furthermore, individuals engaged in an income-producing business keep records of the financial activities of the business for numerous reasons and often use accountants to complete financial statements and tax returns for their business and personal tax returns.

34. Persons engaged in money laundering often maintain such records for long periods of time, particularly when they are involved in ongoing criminal conduct over a long period of time. Based on my experience and review of *United States v. Greany*, 929 F.2d 523 (9th Cir. 1991), where there is a long-term or ongoing criminal business or where the evidence is of a nature that would be kept long after the criminal activity has ceased (e.g., financial records), the passage of long periods of time will not make the evidence supporting the issuance of a warrant stale. There are many reasons why persons maintain evidence for long periods of time. For example, the evidence may be necessary business records which must be kept for information reporting purposes, such as for state and Federal tax returns, loan applications, to produce profit-and-loss statements and balance sheets and for "parent" company reporting. The evidence may also be innocuous at first glance (e.g., financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials) but have significance and relevance when considered in light of other evidence. The offender may no longer realize he/she still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence. The offender may also be under the mistaken belief that he/she has deleted, hidden or further destroyed any computer-related evidence, which in fact may be retrievable by a trained forensic computer expert. Furthermore, the proceeds generated from both legal and illegal activities may be spent many years after the activity has stopped. Thus, records reflecting

8

income and expenditures for the time period spanning the activity and those years immediately following the end of this activity are essential to any financial investigation.

## Basis for Facts and Circumstances

35. The conclusions and opinions set forth below are based on my experience and training as a special agent, my direct participation in this investigation as described below, and conversations with other law enforcement officers who are familiar with the facts and circumstances of this investigation. Throughout this affidavit, all sentences that begin with the words "I believe" are based upon this combination.

36. As detailed below, the probable cause supporting the issuance of these search warrants is based on an extensive multi-year investigation that included the review of utility and real estate transaction records, bank records, physical, electronic, and video surveillance, reports and information from other law enforcement investigations, consultations with a Sacramento Municipal Utility District (SMUD) representative[2], telephone toll analysis and evidence obtained from previously executed search warrants. I believe the probable cause outlined in this affidavit will show that it is likely that the locations detailed in Attachments A-1 through A-13 will contain evidence and items detailed in Attachment B for the above noted search warrant locations.

## Targets of the Investigation

37. The targets of this investigation include: Leonard YANG (hereinafter YANG), Xiu Ping LI, a.k.a. Xiuping LI (hereinafter X. P. LI), Gui Wen PAN (hereinafter G. PAN), Xiu Ru LI, a.k.a. Xiuru LI (hereinafter X. R. LI), Yongjie LIU (hereinafter Y. LIU), Dao Zhong WEI (hereinafter D. WEI), Zutao LI (hereinafter Z. LI), Shui Ping ZHENG (hereinafter S. ZHENG) Bi Yun LI (hereinafter B. LI) and You An LI (hereinafter Y. LI).

## Facts and Circumstances Establishing Probable Cause

38. In August 2014, the DEA Sacramento District Office and the Elk Grove Police Department (EGPD)  initiated a federal investigation of a criminal organization that was believed to be responsible for the cultivation and distribution of marijuana on a large scale. The organization was believed to be purchasing homes in the Sacramento, CA region and converting them into indoor marijuana cultivation sites, and then trafficking the processed marijuana to other parts of the country, particularly the Eastern United States. This investigation eventually identified Leonard YANG as one of the individuals responsible. As part of this investigation, on September 14, 2016, the DEA, IRS-CI, EGPD and the Sacramento County Sheriff's Department (SCSD) executed seven federal search warrants on residences associated with the YANG indoor marijuana growing operation and arrested Leonard YANG and several other individuals pursuant to Title 21 federal drug violations. In total, agents seized approximately 5,496 marijuana plants from the seven residences which were all converted into full-scale indoor marijuana grows.

---

[2] This SMUD employee has investigated hundreds of power theft cases; over 100 of those involved indoor-marijuana cultivations. I have consulted with this employee on previous marijuana investigations and found his analysis and identification of indoor-marijuana operations to be reliable and accurate.

39. On June 2, 2016, during the YANG investigation, your affiant conducted a drive-by surveillance of 9501 Jeffcott Road, Wilton, California (hereinafter 9501 Jeffcott) and observed several vehicles with out-of- state license plates parked at the residence. One of the vehicles observed was a 2013 Honda bearing Louisiana license plate XJS712. According to Louisiana Office of Motor Vehicles (LOMV) records, Louisiana license plate XJS712 is registered to Yongjie LIU [Y. LIU] and Zutao LI [Z. LI] of 417 Cherokee Lane, Lafayette, Louisiana (hereinafter 417 Cherokee Lane). As indicated earlier, Y. LIU and Z. LI are subjects in the current federal investigation.

40. Furthermore, based on information obtained from HSI Sacramento, your affiant learned that on May 11, 2017, Z. LI was interviewed by U.S. Customs and Border Protection (CBP) at the Seattle Tacoma Airport Port of Entry after he arrived on a flight originating from Shanghai, China. From the interview, CBP learned that Z. LI's current residence was 417 Cherokee Lane and his phone number was 337-577-3458. A CBP inspection of Z. LI's bags revealed multiple fliers for plant growing chemicals and fertilizers including an informational flier for Dyna-Gro fertilizers, New Millennium Nutrients and Emerald Harvest. DEA Special Agent Jason Chin conducted a review of the websites for Dyna-Gro fertilizers, New Millennium Nutrients and Emerald Harvest and discovered that Dyna-Gro fertilizers and Emerald Harvest actively market their products for the use of growing marijuana indoors or provide advice on growing marijuana indoors. An Internet search of Dyna-Gro fertilizers, New Millennium Nutrients and Emerald Harvest returned results for marijuana growing discussion forums where each company's fertilizer products are reviewed and discussed.

41. At approximately the same time as the Sacramento DEA drug trafficking investigation was commenced, a parallel financial investigation pertaining to how the residences used for cultivation were purchased was initiated by Internal Revenue Service, Criminal Investigation (IRS-CI). Both the DEA drug trafficking and the IRS financial investigation have continued to this date.

42. During the course of the YANG financial investigation, the escrow and loan files pertaining to the purchases of the YANG marijuana grow houses were reviewed. In general, the purchases of all followed a similar pattern. The buyer of the property, in several cases Leonard YANG and in other cases different individuals, put $10,000 down as an Earnest Money Deposit (EMD), usually through a domestic wire transfer or a cashier's check. Subsequently, additional domestic wire transfers or cashier's checks, often from multiple individuals not listed as co-buyers on any of the documents, were deposited into escrow. The domestic source bank accounts were reviewed and reveal that in every YANG home purchase, at least a portion of the down payment was traced back to wire transfers from China. On most occasions, the buyers put down at least 40-50% of the cost of the home, and then obtained financing from a "hard-money" lender for the balance of the purchase price, at substantially higher interest rates than the current conventional loan market offers. This financing generally took the form of a two-year, 10% interest-only note that had to be paid in full at the end of the two-year period.

43. The hard-money lenders used most often were identified as Petaluma-based FJM Private Mortgage Fund, LLC (and its subsidiaries Northern California Mortgage Fund IX, LLC, Northern California Mortgage Fund X, LLC and Northern California Mortgage Fund XI, LLC), as well as Lone Oak Fund, LLC, a hard-money lender in the Los Angeles area. It is your

affiant's belief that the large down payments and the use of "hard-money" lenders (instead of conventional bank financing with substantially lower interest rates) were done so that the buyer(s) would not have to substantiate their income and/or their ability to repay the loan.

44. Stewart Title escrow records and loan records for the purchase of 9501 Jeffcott identified YANG as the buyer of the property, and showed that YANG purchased the property in March 2016 for $735,000, with a down payment of approximately $398,500 and financing from hard-money lender FJM Private Mortgage Fund, LLC in the amount of $346,702.92. The down payment made by YANG consisted of domestic wire transfers into escrow from bank accounts of YANG and several other individuals. A review of the accounts from where these wire transfers originated revealed that some of the wires into escrow were funded by wire transfers from China that were made to the source account only days before.

45. The escrow records further show that on March 8, 2016, X. P. LI wired $20,000 from her Bank of America account number XXXXXX6819 to Stewart Title Company as part of the purchase of 9501 Jeffcott. In addition, the escrow records show that Y.J. LIU was also an investor, having wired $15,500 from his Chase Bank account number XXXXXX9390 on March 11, 2016.

46. Records for X. P. LI's Bank of America account number XXXXXX6819, used by her to wire funds for the purchase of 9501 Jeffcott, revealed that in addition to X. P. LI investing in 9501 Jeffcott, she also purchased two other Sacramento area residences at 13734 Montfort Road, Herald, California (hereinafter 13734 Montfort) and 7810 Elsie Avenue, Sacramento, California (Target Property 1). The account records also revealed that she was an investor in the purchase of a third property which was also found to be consuming an unusually high amount of electrical power per month and was more than likely a marijuana grow as well. This property has since been sold and is not a subject property in this affidavit. Furthermore, X.P. LI sold 13734 Montfort and it is also therefore not a subject property in this affidavit, although its purchase and use as indoor marijuana grow site is relevant as shown below.

47. The Purchase and Use of 13734 Montfort as a Marijuana Grow Site. According to the purchase records for 13734 Montfort, X. P. LI made an offer to purchase 13734 Montfort on or about April 28, 2016, for $505,000. Originally, the purchase agreement was in the name of X. R. LI (X. P. LI's sister and also a subject of this investigation) but was changed to X. P. LI via an addendum to the purchase agreement dated April 28, 2016. X. P. LI made a down payment of $291,200 toward the purchase of 13734 Montfort. An analysis of the source of funds for the $291,200 down payment revealed that part of the down payment consisted of an $82,000 wire transfer from X. R. LI and D. WEI (X. P. LI's brother-in-law and also a subject of this investigation) and a $40,000 wire transfer from S. ZHENG (also a subject of this investigation). In addition, a wire transfer from China in the amount of $49,985, deposited into X.P. LI's Bank of America account number XXXXXX6819, was also a portion of the down payment funding. On or about June 6, 2016, the escrow closed for 13734 Montfort and title passed to X. P. LI.

48. In October 2016, your affiant was notified by the Sacramento County Sheriff's Department, Central Division's Problem Orientation Policing (POP) team that on October 19, 2016, the POP team conducted a "knock and talk" to verify marijuana recommendation

compliance at 13734 Montfort. On that date, the POP team discovered that 13734 Montfort contained a large-scale indoor marijuana grow totaling 1,820 marijuana plants and 544 marijuana clones. The POP team, along with a Community Development Sacramento Building Permits and Inspection code enforcement representative, issued a notice of violation on 13734 Montfort for having a marijuana grow house, for making illegal electrical panel modifications, for a lack of SMUD safety inspections of the electrical panel modifications and for having unpermitted areas used as a marijuana grow including an enclosed patio cover, living room, and all bedrooms. The violation notice advised the owner, X. P. LI, that she was in violation of County ordinances and that she had 10 days to correct the violations and to get rid of the plants. The POP, in coordination with SMUD, shut off power to the residence. According to the POP, after the 10 days, they visited the Montfort residence and noted that no one was present and the marijuana plants were gone. On November 7, 2016, your affiant requested SMUD provide subscriber information and power usage for 13734 Montfort. SMUD responded that the customer's name was Xian Dong ZHU, and that service started on July 21, 2016. SMUD also indicated service ended on October 19, 2016 (when the power was shut off due to the marijuana grow being found on that date). SMUD also indicated that prior month usage was 11,589 Kwh and during the period of September 29, 2016 through October 19, 2016 (a shortened month due to the power being shut off) the power usage was 7,615 Kwh, which, according to SMUD and my training and experience, is indicative of a marijuana growing operation taking place at the residence.

49.   On November 17, 2016, your affiant learned that LI identified herself as the owner of 13734 Montfort to the Sacramento County Code Enforcement Department (SCCED) representative. LI also provided the SCCED representative with her New Jersey Driver's License bearing license number L40017897758762 and requested that power be restored to the residence.

50.   SMUD further provided power usage at the residence for twenty months prior to X. P. LI's purchase of the residence, as well as power usage subsequent to her purchase (through the latest billing cycling ending 10/19/2016 when the power was shut off). An analysis of the power usage revealed that for the twenty months prior to X. P. LI purchasing 13734 Montfort, the power usage averaged approximately 486 Kwh per month, and the average bill was approximately $69. The analysis further revealed that after X. P. LI purchased 13734 Montfort, the power usage almost immediately increased and averaged approximately 14,730 Kwh per month (a 3,000% increase) through October 19, 2016, and the average bill was approximately $2,772 (nearly 4,000% higher).

51.   On January 20, 2017, I received records from Home Depot for purchases made by X. P. LI from August 24, 2016 through December 27, 2016. According to the Home Depot records, X. P. LI placed an order for delivery to 13734 Montfort under order number H6674-23008 on or about August 24, 2016. X. P. LI provided telephone number 646-683-2388 for the order. Items on the order included lumber construction material such as 2x4s and plywood, insulation and screws. Order number H6674-23008 was delivered by Home Depot to 13734 Montfort on or about August 30, 2016. Other items purchased by X. P. LI from Home Depot included contractor trash bags, hedge trimmers, electrical panels, electrical breakers and electrical wiring. Based on my training and experience, I am aware that it is common for indoor

marijuana growers to purchase construction materials such as lumber, insulation, screws and electrical wiring and equipment to construct indoor marijuana gardens.

52.  In April 2017, agents learned that the real property located at 13734 Montfort Road had been sold.  The fact that the property was sold, after having only been owned for approximately nine months, is further indicative of the fact that it was purchased solely to grow marijuana.  It is your affiant's belief that X.P. LI sold 13734 Montfort Road because it was no longer suitable to grow marijuana due to the October POP team and SMUD actions.

53.  From various business and financial records, and SMUD utilities service records obtained in this investigation, I identified two telephone numbers 646-683-2388 and 646-683-3588 which are serviced on the same account.  According to AT&T records, telephone numbers 646-683-3588 and 646-683-2388 are subscribed to X. P. LI and were activated on January 3, 2016.

54.  While conducting location checks at Target Property 1 through 8, your affiant consistently observed the residences had the outwardly appearance of a house being used to grow marijuana.  All the windows blinds were drawn tightly over the windows.  Based on my training and experience, I know that marijuana cultivators commonly block the windows with Mylar or other materials and close the blinds tightly to prevent anyone from seeing into the residence or light of high power lamps from shining outside the residence, especially during night-time hours.  They do this to conceal their illegal operations because neighbors or law enforcement would likely notice bright shining lights during all hours of the day and night as their high power lights cycle on and off on 12-18 hour cycles.  I have observed a garage door partially rolled up which would be a substitute for the partially open window.  Marijuana cultivators commonly keep one or two windows partially open in order to ventilate their marijuana gardens.  These partially open windows or partially open garage doors allow fans to forcefully suck air into the house in order to provide air for the marijuana plants being grown.  I have observed a partially open window in only a few of the Target Properties for several reasons. First, some of the Target Properties are situated deep away from the public road with a private driveway making it difficult to view the windows.  In addition, it is your affiant's belief that due to YANG's arrest and seizure of marijuana grow properties that YANG's associate LI and co-conspirators have become more cautious and are intentionally selecting windows in the back of the houses to ventilate the grows to avoid detection by authorities.

55.  Your affiant has attempted to conduct quick trash bin searches at Property 1 through 7 but has not been successful due in part because the trash bins were not being placed on the curb on the date of service and or the green waste services are not being utilized.  In my training and experience it is probable and not uncommon for marijuana cultivators to dispose the marijuana clippings discretely at a waste disposal facility so as to conceal their illegal activity.

## Target Properties to be Searched

### Target Property 1 - 7810 Elsie Avenue, Sacramento, California

56.  Target Property 1 was identified through Sacramento County records and an analysis of X.P. LI's Bank of America account number XXXXXX6819.  These records revealed that prior to investing in YANG's marijuana grow operation at 9501 Jeffcott in March 2016 and

her purchase of the marijuana grow site at 13734 Montfort in June 2016, X.P. LI purchased Target Property 1 in February 2016.

57.  According to escrow records for Target Property 1, X. P. LI made an offer to purchase this property on or about January 14, 2016, for $325,000, which was approved by the seller on or about that same date, and escrow account #54911-1404614-16 was opened at North American Title Company in Elk Grove, CA on or about January 15, 2016.  On February 16, 2016, X. P. LI initiated a wire transfer from Bank of America account number XXXXXX6819 in the amount of $132,746.49 to North American Title Company escrow number 54911-1404614-16 for the purchase of Target Property 1.  The escrow for Target Property 1 closed on or about February 22, 2016, and title passed to X. P. LI.

58.  On November 07, 2016, your affiant requested subscriber information and power usage from SMUD for Target Property 1.  The SMUD records identified D. WEI (X. P. LI's brother-in-law) as the subscriber to electrical service at Target Property 1 and listed telephone number 917-957-0367 as the contact telephone number for the SMUD account.  The SMUD records also showed that D. WEI started service on February 26, 2016.  For the period of September 23, 2016, through October 21, 2016, the power usage at Target Property 1 was 11,826 Kwh.  Your affiant learned from SMUD investigators that SMUD has replaced electrical panels at Target Property 1 for high power usage.  Based on my training and experience, your affiant knows that this is a high amount of power use, commonly observed in residences being used to grow marijuana.

59.  SMUD also provided power usage at the residence for fifteen months prior to X. P. LI purchasing Target Property 1, and power usage for the nine months following her purchase with billing cycle ending on November 21, 2016.  An analysis of the power usage revealed that for the fifteen months prior to the purchase of Target Property 1, the power usage averaged approximately 1,272 Kwh per month with an average bill of approximately $208, which according to SMUD, is indicative of normal power usage for a residence the size of Target Property 1.  In comparison, the power usage after X. P. LI purchased Target Property 1 immediately increased and averaged approximately 9,996 Kwh per month with an average bill of approximately $1,647.

60.  On December 20, 2016, agents conducted surveillance at Target Property 1.  During the surveillance investigators observed a Black Infiniti SUV, subsequently identified as bearing California license plate 7RAJ324 which is registered to D. WEI parked in the driveway.  Surveillance investigators observed D. WEI and X. R. LI depart Target Property 1 in a silver Honda Van bearing California license plate 7RAJ323, which is registered to D. WEI.  Investigators followed D. WEI and X. R. LI to several Sacramento residences which were listed for sale.  Investigators subsequently, followed D. WEI and X. R. LI to 8638 Bradshaw Road, Elk Grove, California [**Target Property 2**].

61.  On January 4, 2017, subsequent to receiving an administrative subpoena, T-Mobile provided subscriber information for telephone number 917-957-0367, the telephone number was listed on the SMUD service account for Target Property 1.  According to T-Mobile, telephone number 917-957-0367 is subscribed to G. PAN (X.P.LI's husband and a subject of this investigation).

14

62. On January 11, 2017, surveillance agents observed D. WEI and X. R. LI depart Property 1 in the silver Honda Van (7RAJ323). Surveillance agents followed D. WEI and X. R. LI to several Sacramento residences/properties which were listed for sale. Based on my training and experience, I am aware that it is common for subjects to locate additional residences for the purpose of cultivating marijuana indoors.

63. On January 19, 2017, I conducted a check of Target Property 1 and observed a black Infiniti (7RAJ324), and a Honda Van (CA 7RAJ323) and a Honda van (LA XJS712). I observed the Honda van depart (LA XJS712) and a few minutes' later two cars, a gold Van and truck occupied by Asian males arrived.

64. On February 2, 2017, I conducted a check of Target Property 1 and observed the black Infiniti (7RAJ324), parked in the driveway and two Asian Males depart in a Toyota van (CA 7TDW264) registered to D. WEI. Your affiant, has observed other Asian Males frequenting the suspected marijuana grow houses while conducting location check or surveillance operations of LI and co-conspirators. Your affiant believes these other co-conspirators are likely "workers" for LI who are assisting in the daily maintenance of the grow houses.

65. On March 22, 2017, agents conducted surveillance at Target Property 1 and observed D. WEI and X. R. LI depart in a light color Toyota Van (CA 7TDW264). Agents followed the Toyota Van (CA 7TDW264) to 8967 Sonoma Valley Way, Sacramento, California **[Target Property 5]**. At approximately 11:50am, your affiant observed the Toyota Van (CA 7TDW264) enter the garage and it closed immediately. At approximately 4:00pm, agents observed D. WEI and X.R. LI depart Target Property 5 and return to Target Property 1. Based on my training and experience, I am aware that it is common for marijuana growers to access the grow residence through the garage without being identified and as a means to load and off load marijuana grow material, or marijuana without being detected by authorities.

66. On May 24, 2017, I requested power usage for Target Property 1 from SMUD. SMUD's records maintain D. WEI (X. P. LI's brother-in-law) as the subscriber and provided the previous month's usage as 11,358 Kwh with an average monthly power usage of 11,673 Kwh. Based on my training and experience, your affiant knows that the extremely high power usage at Target Property 1 is a strong indicator that an indoor marijuana growing operation is continuing to being maintained.

67. On July 6, 2017, Agents conducted a check of Target Property 1 and observed D. WEI meet with two additional Asian males. After the males departed, your affiant observed D. WEI walked to the mail box and return to Target Property 1.

68. On July 10, 2017, I conducted a check of Target Property 1 and observed a Toyota [7YBN312] at Target Property 1. This same Toyota was previously seen on surveillance at 8114 Suarez Way, Elk Grove, California [Target Property 7]. Based on my training and experience, your affiant knows that members of an organization assist one another in the cultivation of the marijuana. It is likely that co-conspirator utilizing the Toyota are assisting in tending the marijuana grow at Target Property 7 and Target Property 1.

69. On July 10, 2017, your affiant submitted requests to SMUD for subscriber and power usage with records of neighboring residence for power usage comparisons. SMUD identified D. WEI (X. P. LI's brother-in-law) as the subscriber with the average monthly power usage for Target Property 1 as 11,618 Kwh. During 5/26/2017 to 6/26/2017 power usage was 12,003 Kwh. In comparison of two neighboring residences that had a monthly average power usage of 1,216 Kwh and the second residence usage was 1,146 Kwh per month average.

## Target Property 2 – 8638 Bradshaw Road, Elk Grove, California

70. Target Property 2 was identified during surveillance of D.WEI and X.R.LI. on December 20, 2016.

71. On December 21, 2016, your affiant requested customer information from SMUD for Target Property 2. According to SMUD, service at Target Property 2 is rendered to Y. LIU, and service was established on October 6, 2016. The power usage from October 21, 2016 to November 18, 2016 was 11,302 Kwh and the average monthly power usage was 7,432 Kwh. The power usage from April 25, 2017 to May 24, 2017, was 12,398 Kwh and the monthly average power usage was 9,777 Kwh. Your affiant learned from SMUD investigators that SMUD has replaced electrical panels at Target Property 2 due to high power usage. Based on my training and experience, your affiant knows that this is a high amount of power use, commonly observed in residences being used to grow marijuana. Based on a review of real property records, it is believed that Target Property 3 is being rented, as opposed to being owned by the subjects of this investigation.

72. On January 5, 2017, your affiant conducted a location check at Property 2 and observed a 2013 Honda Van bearing Louisiana license plate XJS712 (Registered to Y. J. LIU, and Z. LI) parked in the driveway. As indicated earlier, during the YANG investigation, your affiant observed the same 2013 Honda Van bearing Louisiana license plate XJS712 (Registered to Y. J. LIU and Z. LI) parked in the driveway at 9501 Jeffcott Road Wilton, California.

73. On January 11, 2017, agents conducted surveillance at Target Property 2. Investigators observed Y. LIU depart Target Property 2 driving the 2013 Honda Van bearing Louisiana license plate XJS712 (Registered to Y. J. LIU and Z. LI).

74. On January 11, 2017, AT&T responded to an administrative subpoena requesting subscriber information for telephone number 231-510-5688. According to AT&T records, telephone number 231-510-5688 was subscribed to Y. J. LIU. Additionally, according to cellular phone records, phone number (646) 683-3288, known to be subscribed to and used by X.P. LI, was in contact with phone number (231) 510-5688, known to be subscribed to and used by Y. J. LIU, on at least 936 occasions from 09/03/2016 through 5/11/2017, indicating they are associates. In fact, during this time period, Y. LIU was X.P. LI's second highest frequency caller.

75. On January 19, 2017, I observed an Asian male depart driving the 2013 Honda van bearing Louisiana license plate XJS712 (Registered to Y. J. LIU and Z. LI) from Target Property 1.

16

76. On February 14, 2017, The Honorable Allison Claire, United States Magistrate Judge for the Eastern District of California, authorized the initial federal search warrant to obtain precise location data for cellular telephone number 231-510-5688, a telephone number subscribed to Y. J. LIU.

77. On February 23, 2017, at approximately 2:30pm, DHS and DEA conducted surveillance at Property 1 and Property 2. Location data for telephone number 231-510-5688 was located in the vicinity of Property 1. At approximately 4:43pm, I observed the Honda van (CA 7RAJ323) depart Property 1 driven by an Asian Male. The location data for telephone number 231-510-5688 indicated it was in the same vicinity as the Honda Van (CA 7RAJ323) near the area of a hydroponics business, Genesis, located at 6047 Power Inn Road, Sacramento, California. Based on my training and experience, I know that marijuana cultivators commonly frequent hydroponics businesses to purchase their growing equipment and supplies such as soil bags and fertilizer. I believe LIU was likely purchasing marijuana growing supplies at the hydroponics store for the suspected indoor marijuana grow at Target Property 2.

78. On March 2, 2017, I observed the 2013 Honda Van driven by Y.J. LIU bearing Louisiana license plate XJS712 (Registered to Y. J. LIU and Z. LI) depart from Target Property 2.

79. On March 14, 2017, at approximately 10:30 a.m., investigators conducted surveillance at Target Property 2. I received precision location data for telephone number 231-510-5688 which indicated it was located in the vicinity of Target Property 2. At approximately 1:05 p.m., investigators observed a Honda van (LA XJS712) depart Target Property 2. At approximately 1:26 p.m., I received precision location data for cellular telephone number 231-510-5688 which indicated it was located in the vicinity of Genesis, located at 6047 Power Inn Road, Sacramento, California. I observed the Honda Van (LA XJS712) parked in the parking lot in front of Genesis. Based on my training and experience, I am aware that it is common for marijuana growers to purchase indoor growing supplies, fertilizers, soil and equipment used in indoor marijuana grows from hydroponic stores such as Genesis.

80. On January 31, 2017, your affiant requested via administrative subpoena the Thunder Valley Casino Resort provided player data pertaining to Y.J. LIU. Your affiant requested the information after noting that his location data for telephone number 231-510-5688 was in the vicinity of the Casino. On March 10, 2017, your affiant requested an update pertaining to Y.J. LIU's player data account information. According to Thunder Valley Casino Resort records, from October 17, 2016 through April 6, 2017, Y. J. LIU has purchased at least 1.3 million gaming chips at the casino. Furthermore, Thunder Valley records reflected that Y.J. LIU cashed in over 1.2 million in gaming chips during this time period.

81. On July 6, 2017, your affiant conducted a location check of Target Property 2 and observed a white Toyota (CA7LUZ571) registered to Zhen LIN, 7709 South Parkway, Sacramento. In March 2017, Zhen LIN (a.k.a. Zhen Shang LIN) was arrested by the Yuba County Sheriff's Department for his involvement in a large-scale indoor marijuana growing operation conducted at residences in Yuba and Sacramento Counties. During that investigation, law enforcement officials executed state of California search warrants at nine houses (including 7709 South Parkway), arrested or contacted 15 individuals, and seized approximately 6,493

17

marijuana plants, U.S. currency, and several weapons, including a Del-Ton .223 AR rifle and ammunition.

82. On July 10, 2017, your affiant submitted a request to SMUD for subscriber and power usage for Target Property 2 with records of neighboring residence for power usage comparisons. SMUD records maintain service is listed to Y.J. LIU with the average monthly power usage of 9,930 Kwh. During 5/25/2017 to 6/23/2017 power usage was 11,155 Kwh. In comparison to two neighboring residences whose monthly average power usage was 1,216 Kwh and the second residence usage was 1,146 Kwh. Your affiant learned from SMUD investigators that SMUD has replaced electrical panels at Target Property 2, for high power usage. Based on my training and experience, your affiant knows that this is a high amount of power use, commonly observed in residences being used to grow marijuana.

83. On July 13, 2017 agents conducted surveillance at Target Property 2 and observed driver, Y. LI and passenger, X.P.LI depart in a Honda van bearing California license plate 7WZA583. According to DMV records, previous Honda van bearing Louisiana license plate XJS712 bearing the same Vin number currently registered with California license plate, 7WZA583 to Y. LIU.

### Target Property 3– 2860 Central Avenue, Roseville, California

84. Target Property 3 was identified from a review of the bank records of subject S. ZHENG, who had invested $40,000 in the 13734 Montfort Road purchase by X.P. LI in May 2016. After wiring the $40,000 into the Montfort Road escrow from his PNC Bank account #XXXXXX5586, it was observed that S. ZHENG later received into the same account a wire from China for $49,785 on August 22, 2016 and wired $47,000 into Stewart Title escrow #SO-01029781-CT two days later on August 24, 2016 for the purchase of Target Property 5.

85. Stewart Title records revealed that on or about July 26, 2016, B. LI made an offer of $660,000 for the purchase of Target Property 5. On or about July 27, 2016, the offer was accepted by the seller and escrow number SO-01029781-CT was subsequently opened at Stewart Title. According to the escrow records, funds in the amount of $280,000 were deposited into the escrow account as a down payment for Target Property 5 from B. LI and others who deposited funds for the benefit of B. LI. After examining the source accounts for the down payment, it was determined that $179,455 was traced back to wire transfers emanating from China. The remaining balance of the down payment was derived from numerous small checks from many individuals and cash deposits to the source accounts. Financing for the balance in the amount of $396,000 was provided by hard-money lenders James R. Hall & Carol F. Hall. On or about August 29, 2016, the escrow closed for Target Property 5 and title passed to B. LI.

86. On February 10, 2017, PG&E responded to an administrative subpoena requesting electrical utility subscriber information and power usage for Target Property 5. PG&E records identified S. ZHENG as the current subscriber with a start date of September 15, 2016, and also identified telephone number 248-761-8760 for S. ZHENG. Power usage for the period of January 2017 was 9,823 Kwh with a bill of 3,818.61. Based on my training and experience, your affiant knows that this is a high amount of power use, commonly observed in residences being used to grow marijuana.

87. On February 21, 2017 through February 28, 2017, surveillance agents observed B. LI and S. ZHENG going from Target Property 3 to Target Property 4 in a Toyota (7PBT360). Inquiry of DMV records indicate the Toyota, 7PBT360, was registered to Shui Ping ZHENG, 2860 Central Ave. Roseville, CA [Target Property 3].

88. On February 23, 2017, investigators established surveillance at 2860 Central Ave, Roseville, California and observe an Asian male arrive driving the Toyota [7PBT360]. The Asian male met with a second Asian male in the driveway. Investigators observed both men depart in the Toyota [7PBT360]. Investigators observed the Toyota [7PBT360] arrive at 10315 Baseline Rd., Elverta, California **[Target Property 4]**. On February 28, 2017, investigators established surveillance at Target Property 3. Investigators observed an Asian male, subsequently identified as S. P ZHENG arrive driving the Toyota [7PBT360] accompanied by an Asian female passenger subsequently identified as B. LI. Later, investigators observed S. P. ZHENG depart driving the Toyota [7PBT360] with the B. LI as the passenger. Detectives observed the Toyota [7PBT360] arrive and park in front of Target Property 4.

89. Since June 2017, Target Property 3 has been under video surveillance. DEA investigators have monitored the video surveillance in real time and/or reviewed recordings of the video surveillance. Cars bearing out of state plates, such as Louisiana, and rental vehicles have frequented Target Property 3. On June 1, 2017 your affiant observed a Van bearing California plate, 6YNT398 registered to Y.A. LI 10315 Baseline Road, Elverta, California [Target Property 4] parked in the driveway at Target Property 3. Your affiant observed an Asian male, Y. A. LI depart driving the VAN [6YNT398]. Your affiant followed the Van [6YNT398] to Target Property 4. Based on my training and experience, I believe that B.LI and S. ZHENG and co-conspirators are associates that have established marijuana grows at Target Property 3 and Target Property 4. In my training and experience marijuana growers in addition to cultivating marijuana indoors may use the residences as a packaging and distribution center for their illegal operations. I believe the secluded parking in the rear of Target Property 3 assists to conceal their activities.

90. On June 20, 2017, agents observed a gray Toyota Sienna van bearing California license plate, 6YNT398, registered to Y. A. LI arrived at Target Property 3. An Asian male believed to be Y. A. LI exited the gray Toyota Sienna and unloaded two dark colored trash bags from the van and carried the bags toward the residence. Approximately ten minutes later, the Asian male returned to the Toyota van and entered the vehicle. The Asian male appeared to be carrying only an electronic device in his hand upon returning to the vehicle. As will be shown below, subject Y.A. LI invested money in the purchase of both 10315 Baseline Road, Elverta, California **[Target Property 4]** and 3433 La Cadena Way, Sacramento, California **[Target Property 8]**.

91. On June 22, 2017, your affiant observed a white Toyota Sienna van bearing Louisiana license plate SFD731 arrived at Target Property 3. Based on surveillances from this investigation, license plate SFD731 was identified as a Louisiana license plate registered to Ai H. Chen and Youmin Li of 417 Cherokee Lane, Lafayette, Louisiana. As discussed in paragraphs 39 and 40, 417 Cherokee Lane was identified as an address for Z. LI and Y. LIU. Furthermore, based on public records, it is believed by investigators that Ai H. Chen is the spouse of Z. LI. An Asian male, who appeared to be Z. LI, and an Asian female were observed

19

exiting the white Toyota van and walking toward the residence. As discussed in paragraph 40, Z. LI was interviewed by U.S. Customs on May 11, 2017 upon reentry into the United States Z. LI had in his possession informational fliers regarding hydroponic fertilizers.

92. On July 13, 2017, PG&E responded to an administrative subpoena requesting electrical utility subscriber information and power usage for Target Property 3. The PG&E records list S. ZHENG as the current subscriber with a start date of September 15, 2016, and also identified telephone number 248-761-8760 for S. ZHENG. Power usage for the period of May 2017 was 7,705 Kwh with an average monthly power usage of 7,369Kwh. The billed amount for that period was $2,839.95. Based on my training and experience, your affiant knows that this is a high amount of power use, commonly observed in residences being used to grow marijuana.

### Target Property 4 – 10315 Baseline Road, Elverta, California

93. As indicated above, agents conducting surveillance at Target Property 3 observed B. LI and S. ZHENG depart Target Property 3 and arrive at Target Property 4 in the Toyota (7PBT360) on February 23, 2017.

94. According to escrow records, Li LI, (a 27 year old female who has a last known address of 760 S. Edmonds Lane, Apartment 8, Lewiston, TX) made an offer to purchase 10315 Baseline Road on or about November 13, 2016 for $450,328, which was approved by the seller on or about that same date, and escrow account #P-185138-LS was opened at Placer Title Company in Roseville, CA on or about November 17, 2016. Deposits to escrow totaled $212,208.43 and consisted of the following:

| Date | Amount | Description |
|------|--------|-------------|
| 11/15/2016 | $5,000.00 | Wire transfer from **Y.A. LI's** Chase Bank account #*****1021, funded by funds on deposit in the account. |
| 1/12/2017 | $89,157.00 | Wire transfer from **Y.A. LI's** Chase Bank account #*****1021, funded by multiple wire transfers from China. |
| 1/13/2017 | $30,000.00 | Wire Transfer from Bo Shi Zhu's Farmer's & Merchants Bank account #*****4582, funded by a $30,000.00 personal check from Danfeng Ni's Bank of America account #2282 on 1/13/2017. This personal check was funded by a $30,000 wire transfer from China on 12/27/2016. |
| 1/13/2017 | $50,000.00 | Wire transfer from Li LI's Wells Fargo Bank account #*****7729, funded by a $50,000.00 wire transfer from China on 12/6/2016. |

| 1/12/2017 | $32,875.80 | Wire Transfer from **S. ZHENG's** Bank of America account #*****2751, funded by a $39,985.00 wire transfer from China on 12/27/2016. |
| 8/24/2016 | $5,175.63 | Wire Transfer from Danfeng Ni's Chase Bank account #*****0872, funded by funds on deposit in the account. |

95.  The balance of the purchase price was paid via a $260,000.00 loan from Socotra Capital, a hard-money lender. Escrow closed on January 13, 2017 and title passed to Li LI.

96.  On April 10, 2017, PG&E responded to an administrative subpoena requesting electrical utility subscriber information and power usage for Target Property 4. The PG&E records identified Y. A. LI as the current subscriber with a start date of January 17, 2017, and also identified telephone number 917-302-0406 for Y.A. LI. Power usage for the period of February 3, 2017 through March 7, 2017, was 3,697 Kwh. The billed amount for that period was $2,092.70. Based on my training and experience, I am aware that extremely high power usage for a residential property is a strong indicator of an indoor marijuana growing operation.

97.  As noted above on June 1, 2017 your affiant followed Y.A. LI driving a Van [6YNT398] registered to Y.A LI from Target Property 3 to Target Property 4.

98.  On July 11, 2017, agents conducted a location check of Target Property 4 and observed Toyota van [6YNT398] backed into the garage with the garage door open. In my training and experience marijuana cultivators commonly keep one or two windows partially open in order to ventilate their marijuana gardens and having the garage door rolled up can be a substitute for the partially open window.

99.  On July 13, 2017, PG&E responded to an administrative subpoena requesting electrical utility subscriber information and power usage for Target Property 4. The PG&E records maintain Y.A. LI as the current subscriber with a start date of September 15, 2016. Power usage for the period of June was 22,411 Kwh. The billed amount for that period was $8,717.96. Based on my training and experience, your affiant knows that this is a high amount of power use, commonly observed in residences being used to grow marijuana.

### Target Property 5 – 8967 Sonoma Valley Way, Sacramento, California

100. Target Property 5 was identified on March 22, 2017 during surveillance of D. WEI and X. R. LI who departed Target Property 1 and were followed to Target Property 5.

101. On March 22, 2017, Agents conducted surveillance at Target Property 1 and observed a Toyota van (CA 7TDW264) parked in the driveway. According to California DMV records, license plate 7TDW264 is registered to D. WEI. On this date, Agents observed D. WEI and X. R. LI drive from Target Property 1 to Target Property 5. Your affiant, observed D. WEI and X. R. LI parked inside the garage of Target Property 5 and remained at the residence for approximately four hours. After departing Target Property 5, D. WEI and X. R. LI returned to Target Property 1. In my training and experience, it is common for marijuana cultivators to

conduct the loading and unloading of marijuana and cultivation equipment inside closed garages in order to conceal their illegal activity.

102. On March 23, 2017, I obtained SMUD records for Target Property 5. According to SMUD, X. R. LI established electrical service at Target Property 5 on February 24, 2017 with telephone number 215-909-1720. On May 26, 2017, SMUD provided power usage for Target Property 5, which revealed the prior month power usage was 8,472 Kwh. Additionally, the average monthly power usage was 5,862 Kwh. Based on my training and experience, I am aware that extremely high power usage for a residential property is a strong indicator of an indoor marijuana growing operation.

103. Your affiant requested subscriber information via an administrative subpoena for telephone number 215-909-1720. According to T-Mobile, the subscriber to telephone number 215-909-1720 is listed as G. PAN (X.P.LI's husband).

104. On July 10, 2017, SMUD provided power usage for Target Property 5 to include power consumption comparisons of neighboring residences. According to SMUD records, service is listed to X. R. LI at Target Property 5 on February 24, 2017. During the period of 5/25/2017 to 6/23/2017 power usage for Target Property 5 was 5,050 Kwh. The monthly average power usage for Target Property 5 was 6,226 Kwh. In comparison to two nearby residence that had average monthly power usages of 533 Kwh and 518 Kwh. Based on my training and experience, your affiant knows that this is a high amount of power use, commonly observed in residences being used to grow marijuana.

### Target Property 6 - 4849 Ammolite Way, Elk Grove, California

105. On or about March 22, 2017, I obtained customer information and power usage data from SMUD for Target Property 6. SMUD identified electrical service was listed to G. PAN for Target Property 6 and listed telephone number 646-683-3588. During this investigation, your affiant knows telephone 646-683-3588 is subscribed to X. P. LI and was previously listed on the SMUD service account for 13734 Montfort Rd residence. The power usage at Target Property 6 for February 16, 2017 through March 1, 2017, was 1,832 Kwh. Based on my training and experience, I am aware that extremely high power usage for a residential property is a strong indicator of an indoor marijuana growing operation.

106. On March 31, 2017, investigators observed a Honda (CA 7RAJ323) registered to D. WEI depart from the garage of Target Property 6. Investigators followed the Honda (CA 7RAJ323) driven by G. PAN to Target Property 7. Investigators observed D. WEI and a Asian male, Guangzhao LI exited Target Property 7. Surveillance agents observed D. WEI and G. LI depart in a Toyota CA 7TDW264 registered to D. WEI in tandem with G. PAN who was driving the Honda (CA 7RAJ323). Investigators followed both vans to Home Depot, Elk Grove, California. Surveillance investigators observed G. PAN, D. WEI, and G. LI meet with X. P. LI and purchase grow material at the Home depot. Surveillance observed G. PAN, D. WEI, G. LI and X. P. LI depart the Home depot. Investigators observed X. P LI depart driving a black Infiniti bearing California license plate, 7RAJ324 registered to D. WEI and followed them to Target Property 7 where they off loaded Home Depot material into the garage. At approximately 4:13pm, X.P.LI and G. LI exited the Target Property 6 and departed in the black

22

Infiniti, 7RAJ324. Investigators followed the black Infiniti to Target Property 1. Based on my training and experience, I know that marijuana cultivators often have other co-conspirators assist them with maintain their marijuana grows. The presence of the Asian males at Target Property 1, Target Property 6 and Target Property 7 is a strong indication of this.

107. On May 24, 2017, SMUD provided subscriber information and power consumption for Target Property 6. According to SMUD service was established on 2/6/2017 and listed to G. PAN. The average monthly power usage for Target Property 6 was 8,279 Kwh. The previous month power usage was 13,722 Kwh. Based on my training and experience, I am aware that extremely high power usage for a residential property is a strong indicator of an indoor marijuana growing operation.

108. On July 5, 2017, at approximately 9:30pm, I conducted a location check of Target Property 6 and observed very bright light emanating from the side windows of the residence consistent with high powered lights commonly used in indoor marijuana grow houses.

109. On July 10, 2017, SMUD provided power usage for Target Property 6 to include power consumption comparisons of neighboring residences. During the cycle of 6/01/2017 to 6/29/2017 it was 11,476 Kwh. The average monthly power usage for Target Property 6 was 9,539Kwh. For comparison, two neighboring houses had average monthly power usage of 799 Kwh and 600 Kwh. Based on my training and experience, I am aware that extremely high power usage for a residential property is a strong indicator of an indoor marijuana growing operation.

### Target Property 7 – 8114 Suarez Way, Elk Grove, California

110. Target Property 7 was identified during surveillance of Target Property 6 on March 31, 2017.

111. On April 4, 2017, your affiant obtained SMUD records for Target Property 7. According to SMUD, Guangzhao LI established electrical service at Target Property 7 on April 4, 2017 therefore there was no usage information available. G. LI listed a contact telephone 267-810-9240.

112. According to Sacramento County real property records, Target Property 7 is titled in the name of Yan Bing LI, of Corona, NY. According to records on file with the U.S. Customs and Immigration, Yan Bing LI is approximately 25 years old and is the daughter of X.R. LI, and therefore the niece of X. P. LI.

113. According to escrow records, Yan Bing LI made an offer to purchase 8114 Suarez Way or about March 8, 2017 for $416,000, which was approved by the seller on March 9, 2017, and escrow account #3414-5407965 was opened at First American Title Company in Sacramento, CA on or about March 10, 2017.

114. Deposits to escrow totaled $175,700.00 and consisted of the following:

| Date | Amount | Description |
| --- | --- | --- |
|  |  |  |

23

| 03/17/2017 | $5,000.00 | Personal check from **D. Z. WEI** (X. P. LI's brother-in-law) Wells Fargo Bank account #*****7863, funded by earlier cash deposits. |
| 03/27/2017 | $70,700.00 | Wire transfer from **X. P. LI's** Bank of America account #*****6819, funded by escrow proceeds received from the sale of 13734 Montfort Road (earlier marijuana grow site). |
| 03/28/2017 | $100,000.00 | Wire Transfer from Yan Bing LI's Bank of America account #*****1160, funded by amounts unknown at this time (subpoenaed records not yet received). |

115. Funding for the balance of the purchase price, like other properties in this and the earlier YANG investigation, was provided by hard-money lender FJM Private Mortgage, LLC.

116. On May 24, 2017, SMUD provided power usage for Target Property 7, which revealed the prior month power usage was 6,941 Kwh. Based on my training and experience, I am aware that extremely high power usage for a residential property is a strong indicator of an indoor marijuana growing operation.

117. Through the service of an administrative subpoena to T-Mobile, I requested subscriber information for telephone number 267-810-9240. According to T-Mobile, the subscriber to telephone number 267-810-9240 is listed to Qian LIN.

118. On July 10, 2017, SMUD provided power usage for Target Property 7 to include power consumption comparisons of neighboring residences. According to SMUD service is maintained to Guangzhao LI. During the cycle 6/01/2017 to 6/29/2017 it was 9,053 Kwh. The power monthly usage for Target Property 7 was 8,718 Kwh. For comparison, two neighboring houses had average power usage of 751 Kwh and 597 Kwh. Based on my training and experience, I am aware that extremely high power usage for a residential property is a strong indicator of an indoor marijuana growing operation.

### Target Property 8 - 3433 La Cadena Way, Sacramento, California

119. Target Property 8 was identified from a review of Y. A. LI's bank records obtained during the investigation of the purchase of Target Property 4. Records provided by JP Morgan Chase revealed that in addition to investing in Target Property 4, Y. A. LI also invested in the purchase of Target Property 8.

120. It should further be noted that during the search warrants executed in the Leonard YANG investigation on September 14, 2016, an individual identified as Yichao CHEN was found in one of the YANG grow houses. Further investigation revealed that Yichao CHEN is the husband of Aizhen LIN. During the execution of the search warrant, escrow records pertaining to the purchase of 3433 La Cadena Way [Target Property 8], as well as bank records pertaining to Yichao CHEN and his wife, Aizhen LIN were found and seized. The seized escrow records reflected that CHEN and LIN were in the process of buying Target Property 8,

24

and the bank records reflected the deposit of approximately $160,000 in wires from China. Due to a suspicion that the funds on deposit at Bank of America were proceeds related to drug trafficking, a local law enforcement officer requested Bank of America to place a freeze on the account on the date of the search warrant. A federal seizure warrant was served on Bank of America and these funds were seized on September 20, 2016.

121. On September 15, 2016, one day after the YANG search warrants and the freeze placed on their account, CHEN and LIN's realtor informed the seller that CHEN and LIN could not continue with the purchase. CHEN and LIN's $3,000.00 earnest money deposit was returned to them at a later date.

122. On September 16, 2016, only one day after CHEN and LIN cancelled their purchase, a new buyer, identified as Fu LI [with an address of 2813 Pioneer Drive, Denton, TX] stepped in to purchase Target Property 8, this time for $350,000, which was agreed to by the sellers on September 18, 2016. The same escrow account at Old Republic Title Company remained open and subsequent deposits to escrow totaled $155,500.00, consisting of the following:

| Date | Amount | Description |
|------------|--------------|-------------|
| 09/21/2016 | $5,000.00 | Wire transfer from Kong Liang Li's Bank of America account #*****4526, funded by a $49,155 wire transfer from China and an as yet unidentified $30,000 transfer into his account. |
| 10/11/2016 | $50,000.00 | Wire transfer from Y.A. LI's Chase Bank account #*****1021, funded by multiple wire transfers from China. |
| 10/11/2016 | $100,500.00 | Wire Transfer from Fu LI's Bank of America account #*****6387, funded by an $80,000 transfer from Kong Liang LI and an as yet unidentified $20,000 transfer into his account. |

123. The balance of the purchase price was paid via a $200,446.78 loan from Northern California Mortgage Fund X, a subsidiary LLC of hard-money lender FJM Private Mortgage Company. Escrow closed on October 11, 2016 and title passed to Fu LI.

124. On March 1, 2017, I obtained SMUD records for Target Property 8. According to SMUD, Zu Gui CHEN established electrical service at Target Property 8 on October 27, 2016 with contact telephone 267-323-8822. Power usage from January 6, 2017 through February 6, 2017 was 12,227 Kwh.

125. On June 14, 2017, your affiant conducted a location check and observed a Toyota CA 7VGM132 registered to Kong Liang LI, 3433 La Cadena Way, Sacramento, California.

126. On July 11, 2017, agents conducted a location check and observed the front window open however it contained what appeared to be a piece of styrofoam in place of a window curtain in the window pane. In my training and experience marijuana cultivators commonly

keep one or two windows partially open in order to ventilate their marijuana gardens and they may be using the styrofoam to block the bright lights during the evening.

127. On July 10, 2017, SMUD provided power usage for Target Property 8 to include power consumption comparisons of neighboring residences. According to SMUD, Zu Gui CHEN remains as the subscriber on the account. The power monthly usage for Target Property 8 was 9,479 Kwh. During the period of 5/09/2017 to 6/07/2017 it was 12,792 Kwh. In comparison, the two neighboring residences had power monthly usage of 553 Kwh and 737 Kwh. Based on my training and experience, I am aware that extremely high power usage for a residential property is a strong indicator of an indoor marijuana growing operation.

## Target Property 9 – 2725 52nd Avenue, Sacramento, California

128. On July 19, 2017, agents conducted a trash search at 7810 Elsie Ave, Sacramento, California, Target Property 1. During the trash search, agents located a bank statement for a Wells Fargo Bank account ending in xxxxxx7863 in the name of D. WEI. The Wells Fargo Bank statement also listed an address 5656 Ehrhardt Avenue, Sacramento, California, for D. WEI. The bank statement documents that on January 20, 2017, D. WEI received $49,944.36 via a wire transfer. On January 23, 2017, the statement indicated D. WEI wired $59,933.21 into Old Republic Title for the purchase of a property. A search of public records revealed that on January 23, 2017, ownership of Target Property 9 was transferred to Sheng WEI, D. WEI's son. Public records also identified Old Republic Title as the title company of record for the property transfer and identified FJM Private Mortgage Fund LLC as the lender. As previously discussed above, FJM Private Mortgage Fund LLC was the lender for several additional Target Properties identified during this investigation. Because the closing date of Target Property 9 and the date of the wire transfer initiated by D. WEI to Old Republic Title is the same, and because Old Republic Title was listed as the title company of record for the property transfer, it is my belief that the $59,933.21 was used to purchase Target Property 9.

129. On July 12, 2017, the Honorable Kendall J. Newman, U.S. Magistrate Judge for the Eastern District of California, authorized a location search warrant for cellular telephone number identified for X.P. LI [Federal District Court case number 2:17-SW-0627 KJN]. On July 19, 2017, agents received precision location data indicating that X. P. LI was located in the vicinity of Target Property 9.

130. On the same date, a DEA agent observed a Honda Odyssey minivan bearing California license plate, 7RAJ323 registered to D. WEI parked in the driveway of Target Property 9. On previously surveillances, Agents have observed X. P. LI's husband G. PAN driving the Van (7RAJ323) from Target Property 6 to Target Property 7.

131. On July 19, 2017, I obtained SMUD records for Target Property 9 to include power consumption comparisons to neighboring residences. According to SMUD, Kangzhen YANG established electrical service at Target Property 9 on March 13, 2017. Power usage from May 19, 2017 through June 19, 2017 was 9,864 Kwh. The average power usage for Target Property 9 was 7,403Kwh. In comparison, power usage at three neighboring residences was 616 Kwh, 493 Kwh and 611 Kwh. Based on my training and experience, I am aware that extremely high

power usage for a residential property is a strong indicator of an indoor marijuana growing operation.

**JP Morgan Chase Bank Safe Deposit Box Account #XXXXXX5981 – YONGJIE LIU**

132. Based on financial transactions observed in bank records provided by JP Morgan Chase, it appears that Y. J. LIU arrived in the Sacramento area from Texas at some point in early 2016. A review of his bank records revealed no paycheck deposits after his arrival in the Sacramento area, indicating that he has been unemployed since he arrived. In addition to Y. J. LIU gambling hundreds of thousands of dollars at casinos in the Sacramento area, the bank account review shows that he also deposited over $57,000 in cash into his account, and also received a wire transfer of $37,300 from China in August 2016.

133. During a review of bank records pertaining to Y. LIU, it was determined that Y. LIU possessed safety deposit box [810304] which is at the JP Morgan Chase Bank branch located at 4450 Florin Road, Sacramento, California. A review of entrance log maintained by JP Morgan Chase Bank, it was determined that since Y.J. LIU opened the safe deposit box on June 13, 2016, he has accessed it approximately 25 times, with the last access being on March 2, 2017. In addition, on several occasions, Y.J. LIU appears to have accessed the safe deposit box on the same date he made cash deposits to his Chase Bank account #XXXXXX9390.

134. Based on his involvement in this drug trafficking conspiracy, lack of apparent legitimate employment, his significant gambling activity documented earlier in this affidavit, and the frequency of Y.J. LIU's access of the safe deposit box, probable cause exists to believe that evidence or instrumentalities of the offenses listed earlier in this affidavit, or proceeds derived from said offenses, may be found inside safety deposit box number 810304.

## I.   SEARCH AND SEIZURE OF COMPUTERS, ELECTRONIC STORAGE DEVICES/DIGITAL DATA, AND FORENSIC ANALYSIS

135. Based on my experience, training, and conversations with other agents, I know that individuals involved with drug trafficking crimes and financial crimes, such as drug trafficking / manufacturing and money laundering, often store information regarding their activities on computers and related electronic storage devices. Accordingly, permission is sought herein to seize and search computers and other electronic devices consistent with the scope of the requested search.

136. Searches and seizures of evidence from computers and other Internet access devices require agents to seize most or all electronic items (hardware, software, passwords and instructions) to be processed later by appropriate personnel in a controlled environment. Digital storage media may include but is not limited to floppy disks, hard drives, tapes, DVD disks, CD-Rom disks or other magnetic, optical or mechanical storage which can be accessed by computers or other electronic devises to store or retrieve data, which can store the equivalent of thousands of pages of information. Users may store information or images in random order with deceptive file names, which requires searching authorities to examine all the stored data to determine whether it is included in the search warrant. This sorting process renders it impractical to attempt this kind of data search on site.

137. Searching digital evidence systems for criminal evidence requires experience in the computer and cellular telephone field and a properly controlled environment in order to protect the integrity of the evidence and recover even "hidden," erased, compressed, password-protected, or encrypted files. Since digital evidence is extremely vulnerable to tampering or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

138. Computers and other digital communications devices contain volatile memory that contains information only while the device is in a powered on and/or running state. I know that powering off the device may result in the loss of the volatile information. Adding an external evidence storage device will cause minor changes to the state of the computer but will allow for the best effort in fully capturing the state of the running evidence. This capture of information requires technical expertise to ensure the resulting data can be examined by all subsequent investigators. This captured information may include current and recent use of the computer, use of encryption, use of other communications devices, routes of Internet and other digital communications traffic and passwords, encryption keys or other dynamic details relevant to use of the system.

139. In order to fully retrieve data from a computer or other digital communications system, the analyst needs all magnetic storage media as well as the storage devices. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware access software or drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media) as well as all instruction manuals or other documentation and data security devices, and all items containing or displaying passwords, access codes, usernames or other identifiers necessary to examine or operate items, software or information seized or to activate specific equipment or software. In cases like the instant one where the evidence consists partly of image and video files, the monitor and printer are essential to show the nature and quality of the graphic images, which the system could produce. Finally, where there is probable cause to believe that the computer and its storage devises, the monitor, keyboard, and modem, hardware and software are all instrumentalities of the crimes of drug trafficking / manufacturing and money laundering in violation of federal law, they should also all be seized as such.

140. As further described in Attachment B, this warrant seeks permission to locate in the Search Location not only computer files that might serve as direct evidence of the crimes described in the warrant, but also for evidence that establishes how computers were used, the purpose of their use, and who used them. Further, as described above and in Attachment B, this application seeks permission to search and seize records that might be found in the Search Location, in whatever form they are found. One form in which the records might be found is that they are stored on a computer's hard drive, or other electronic media. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis of the computer(s) or other electronic storage media seized.

141. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), computer hard

28

drives can contain other forms of electronic evidence as well. In particular, records of how a computer has been used, the purposes for which it was used, and who has used it are called for by this warrant. As described above, data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs store configuration information on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals (e.g., cameras and printers for creating or reproducing images), the attachment of USB flash storage devices, and the times and dates the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created. This information can sometimes be evidence of a crime, or can point toward the existence of evidence in other locations. Evidence of this type is a conclusion, based on a review of all available facts and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand the evidence described in Attachment B is included within the scope of the warrant.

142. In finding evidence of how a computer has been used, the purposes for which it was used, and who has used it, sometimes it is necessary to establish that a particular thing is not present on a drive. For example, I know from training and experience that it is possible that malicious software can be installed on a computer, often without the computer user's knowledge. This software can allow a computer to be used by others. To investigate the crimes described in this warrant, it might be necessary to investigate whether any such malicious software is present on the computer, and, if so, whether the presence of that malicious software might explain the presence of other things found on the computer's hard drive.

143. In order to fully retrieve data from a computer system, the review team needs all electronic storage devices as well as the computer's central processing unit (CPU). The review team may also need the computer's storage devices, the monitor, keyboard, modem, and other related hardware. As in this case where the evidence consists partly of graphic files, the monitor and printer are essential to show the nature and quality of the graphic images that the system could produce. In addition, the review team needs all the system software (operating systems or interfaces and hard drive drivers) and any application software that may have been used to create the data (whether stored on hard drives or on external media).

144. I know from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address. Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the residence.

145. I am familiar with and understand the implications of the Privacy Protection Act (PPA), 42 U.S.C. § 2000aa, and the role of this statute in protecting First Amendment activities. I am not aware of any materials to be searched and seized from the Search Location that are protected materials pursuant to the PPA. If any such protected materials are inadvertently seized, all efforts will be made to return these materials to their authors as quickly as possible.

29

146. As previously mentioned, the search of a computer hard drive or other computer storage medium is a time-consuming manual process often requiring months of work. I know that the seizure of a computer hard drive, by necessity, provides the seizing agency with potential access to data outside the scope of this warrant. A search protocol will be used to uncover evidence, instrumentalities and contraband set forth in Attachment B for which there is probable cause. As part of the search protocol, I intend to direct the review team to search any computer and computer storage medium for those items contained in Attachment B. As it concerns this particular case, I intend to direct the review team to search digital media with some or all of the following methods, not listed in any particular order; however, the listing of these methods is not a representation that these specific techniques will be employed in this case:

a. Keyword Searches: I know that computer forensic utilities provide the capability for a user to search for specific key words that may exist on a piece of digital media. I intend to use specific keywords known to be related to this case, including keywords relating to the enticement of a minor and transfer of obscene material to a minor under the age of 16. A list of keywords utilized will be maintained with the records of the forensic examination.

b. Data Carving: I know that, as previously mentioned, data residue may be left in the "free," "unallocated," or "slack" space of a computer hard drive, that is, the space not currently used by active files. I further know that, as previously mentioned, many operating systems utilize temporary storage often referred to as "swap space" on the hard drive to store contents from main system memory. Such unallocated and swap space may contain the residue of files that can be carved out, often in an automated or semi-automated fashion. I intend to use forensic tools to carve out files, in particular, image files such as JPEG and GIF files. The mere act of carving out such files does not expose me to the contents of such recovered files, but makes those files available for further relevancy checks, such as keyword searches (explained above) and hash value comparisons (explained below).

c. Opening Container Files, Encrypted Volumes, Embedded Files: I know that relevant data may be compressed, encrypted, or otherwise embedded in other files or volumes. It is often not possible through any automated process to examine the contents of such containers without opening them, just as it is not possible to examine the contents of a locked safe without first opening the safe. In the event that compressed, encrypted, or otherwise embedded files or volumes may exist on the seized items, I intend to use sophisticated forensic tools to attempt to open any such container files that may reasonably contain evidence sought in this warrant.

d. File Header / Extension Checks: I know that individuals involved in illegal activities on a computer often change the extension of a file (such as .jpg) to some other incompatible extension (such as .txt) in order to disguise files from casual observers. The extension of a file, however, is not necessarily linked to the "header" of a file, which is a unique marking imbedded automatically in many types of files. By comparing the extension of a file with the "header information"

30

of a file, it is possible to detect attempts to disguise evidence of illegal activities. Such a comparison can be made in an automated process by computer forensic tools.

e.   Registry / Log File Checks: I know that it is necessary in any criminal case to establish not only that a crime has occurred, but also to establish what person committed that crime. Operating systems and computer programs often maintain various administrative files such as logs that contain information about user activities at certain times. In the Windows operating system, for example, some of these files are collectively referred to as "the registry". Such files contain specific information about users, often including email addresses used, passwords stored, and programs executed by a particular user. These files may also contain evidence regarding storage devices that have been connected to a computer at some time. Multiple backup copies of such files may exist on a single computer. I intend to examine these files to attempt to establish the identity of any user involved in the offenses alleged in this affidavit.

f.   Metadata / Alternative Data Streams: I know that many file types, operating systems, and file systems have mechanisms for storing information that is not immediately visible to the end user without some effort. Metadata, for example, is data contained in a file that is not usually associated with the content of a file, but is often associated with the properties of the application or device that created that file. For example, a digital camera photograph often has hidden data that contains information identifying the camera that manufactured it, and the date the image was taken. Some file systems for computers also permit the storage of alternate data streams, whereby a file such as a text file may hide an image file that would not be immediately visible to an end user without some action taken. I know that both metadata and alternative data streams may contain information that may be relevant. Metadata and alternative data streams are often identified and processed automatically by computer forensic utilities. I intend to review any such data that is flagged by any process above as being relevant to the offenses alleged in this affidavit.

## Specific Methods for Searching Digital Evidence

147. With rare exceptions, the above-listed search techniques will not be performed on original digital evidence. Instead, I know that the first priority of a digital evidence forensic examination is the preservation of all data seized. As such, original digital media will be, wherever possible, copied, or "imaged," prior to the start of any search for evidence. The copy will be authenticated digitally as described in the paragraph below.

148. I know that a digital forensic image is the best possible copy that can be obtained for a piece of digital media. Forensic imaging tools make an exact copy of every accessible piece of data on the original digital media. In general, the data contained on the original media is run through a hashing algorithm as described above, and a hash value for the entire device is generated. Upon completion of the imaging process, the same hash algorithm is run on the imaged copy to insure the copy is an exact duplicate of the original. Upon the completion of

31

the search processes described above, which are performed on the image of the hard drive, the hash algorithm is again run on the image copy to insure no alterations of the data occurred during the examination process.

149. In the event that a piece of digital media is found not to be (a) an instrumentality of the offense, (b) a fruit of the criminal activity, (c) contraband, or (d) evidence of the offenses specified herein, it will be returned as quickly as possible.

150. I also hereby request judicial authorization to retain copies of all seized storage media after the review is complete. Criminal Procedure Rule 41 specifically states "The officer may retain a copy of the electronically stored information that was seized or copied." Fed. R. Crim. P. 41 (f)(1)(B). Such judicial authorization is justified in this case in part because:

   a. Should the execution of the warrant uncover data that may later need to be introduced into evidence during a trial or other proceeding, the authenticity and the integrity of the evidence and the government's forensic methodology may be contested issues. Retaining copies of seized storage media may be required to prove these facts and the investigator may retain a copy of seized or electronically stored information pursuant to Fed. R. Crim. P. 41(f)(1)(B).

   b. Returning the original storage medium to its owner will not allow for the preservation of that evidence. Even routine use may forever change the data it contains, alter system access times, or eliminate data stored on it.

   c. Because the investigation is not yet complete, it is not possible to predict all possible defendants against whom evidence found on the storage medium might be used. That evidence might be used against persons who have no possessory interest in the storage media, or against persons yet unknown. Those defendants might be entitled to a copy of the complete storage media in discovery. Retention of a complete image assures that it will be available to all parties, including those known now and those later identified.

   d. The act of destroying or returning storage medium could create an opportunity for a defendant to claim, falsely, that the destroyed or returned storage medium contained evidence favorable to him. Maintaining a copy of the storage medium would permit the government, through an additional warrant if necessary, to investigate such a claim.

   e. Similarly, should a defendant suggest an explanation for the presence of evidence on storage medium or some defense, it may be necessary to investigate such an explanation or defense by, among other things, re-examining the storage medium with that explanation or defense in mind. This may require an additional examination of the storage medium for evidence that is described in Attachment B but was not properly identified and segregated previously.

151. I have not attempted to acquire the sought after material through any other investigative or judicial process.

32

## II.   DATA TO BE SEIZED

152. Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that, in order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize, image, copy, and/or search the following items, subject to the procedures set forth herein:

a.   Any computer equipment or digital devices that are capable of being used to commit or further the crimes outlined above, or to create, access, or store (evidence, contraband, fruits, or instrumentalities) of such crimes, as set forth in Attachment B;

b.   Any computer equipment or digital devices used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners that are capable of being used to commit or further the crimes outlined above, or to create, access, process, or store (evidence, contraband, fruits, or instrumentalities) of such crimes, as set forth in Attachment B;

c.   Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and cell phones capable of being used to commit or further the crimes outlined above, or to create, access, or store (evidence, contraband, fruits, or instrumentalities) of such crimes, as set forth in Attachment B;

d.   Any documentation, operating logs, and reference manuals regarding the operation of the computer equipment, storage devices, or software;

e.   Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

f.   Any physical keys, encryption devices, dongles, or similar physical items which are necessary to gain access to the computer equipment, storage devices, or data;

g.   Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices, or data; and

h.   All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show the actual user(s) of the computers or digital devices during any time period in which the device was used to commit the crimes referenced above, including the web browser's history; temporary Internet files; cookies,

33

bookmarked, or favorite web pages; email addresses used from the computer; MAC IDs and/or IP addresses used by the computer; email, instant messages, and other electronic communications; address books; contact lists; records of social networking and online service usage; and software that would allow others to control the digital device such as viruses, Trojan horses, and other forms of malicious software (or alternatively, the lack of software that would allow others to control the digital device).

i.   All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer or digital device.

j.   All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show contextual information necessary to understand the evidence, contraband, fruits, or instrumentalities described in this attachment.

## Conclusion

153. Based on this affidavit, I believe probable cause exists to believe that Xiu Ping LI, Dao Zhong WEI, Xiu Ru LI, Shui P. ZHENG, Youan LI, Yong Jie LIU and others are presently conspiring to cultivate marijuana for distribution in violation of Title 21, United States Code, Sections 841(a)(1) and 846. In addition, based on financial transactions revealed during this investigation, I believe several of these individuals have conspired to transport, transmit, or transfer a monetary instrument or funds from a place outside of the United States to or through a place inside the United States with the intent to promote the carrying on of specified unlawful activity, in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and (h). I further believe there is probable cause to believe that evidence, fruits, and instrumentalities of these offenses, as further described in Attachment B, will be found at the following locations:

a)  **7810 Elsie Avenue, Sacramento, California (Attachment A-1)**

b)  **8638 Bradshaw Road, Elk Grove, California (Attachment A-2)**

c)  **2860 Central Avenue, Roseville, California (Attachment A-3)**

d)  **10315 Baseline Road, Elverta, California  (Attachment A-4)**

e)  **8967 Sonoma Valley Way, Sacramento, California (Attachment A-5)**

f)  **4849 Ammolite Way, Elk Grove, California   (Attachment A-6)**

g)  **8114 Suarez Way, Sacramento, California  (Attachment A-7)**

h)  **3433 La Cadena Way, Sacramento, California (Attachment A-8)**

i)  **2725 52nd Avenue, Sacramento, California (Attachment A-9)**

**j)   JP Morgan Chase Bank safety deposit box [810304], located at 4450 Florin Road, Sacramento, California. (Attachment A-10)**

**k)   2003 Honda Odyssey, California License #7RAJ323. (Attachment A-11)**

**l)   2008 Infiniti, California License #7RAJ324.(Attachment A-12)**

**m)   2013 Honda Odyssey, California License #7WZA583 same; VIN 5FNRL5H67DB059073 as previous Louisiana License plate XJS712. (Attachment A-13)**

154. I have personally, or other law enforcement officials, observed the search warrant locations described in Attachments A-1 through A-13 and request that search warrants be issued for the items listed in Attachment B of this affidavit.

155. I request that search warrants at the locations should include all rooms, annexes, attics, spaces within walls, behind drywall, basements, garages, carports, outside yard, curtilage, mailboxes, trash containers, debris boxes, storage lockers and areas, cabinets, rooms, sheds, and outbuildings located on the premises. The search should also extend into desks, cabinets, safes, briefcases, purses, trash receptacles, and other storage locations within the premises in which items in Attachment B may be found.

156. I also request that any vehicles to be searched that are under the control of the occupants of the locations to be searched at the time these warrants are served, as evidenced by DMV registration information, possession of keys to the vehicle, observations of the utilization of those vehicle by the occupants, and witness statements or admissions. Based on my training and experience, and through interaction with other experienced law enforcement officers, I know that drug traffickers commonly transport and store the evidentiary items listed in Attachment B in their vehicles. I also know that these vehicles are not commonly registered to the person who has control over them.

157. I request that all bulk marijuana seized during execution of the search warrants be disposed of, except for representative samples taken in accordance with standard DEA policy and procedures.

158. I swear under penalty and perjury that the foregoing information is true and correct to the best of my knowledge, information, and belief.

## Request to Seal

159. The United States requests that the Court order this search warrant and search warrant affidavit be kept under seal until further order of the Court, with the exception that a copy of the search warrant will be left at the scene of the search. The affiant states that the criminal investigation against the LI DTO to include by not limited to), Xiu Ping LI, (X. P. LI), Gui Wen PAN (hereinafter G. PAN), Xiu Ru LI, a.k.a. Xiuru LI (hereinafter X. R. LI), Yongjie LIU (hereinafter Y. LIU), Dao Zhong WEI (hereinafter D. WEI), Zutao LI (hereinafter Z. LI), Shui Ping ZHENG (hereinafter S. ZHENG) Bi Yun LI (hereinafter B. LI) and You An LI

(hereinafter Y. LI) and others is continuing, and further interviews, grand jury appearances, and search warrants are contemplated. Disclosure of the contents of this affidavit could seriously impede the investigation by disclosing details of the government's investigation and evidence gathered in connection therewith. The targets and subjects of the investigation would be able to learn the present extent of the government's knowledge. Accordingly, the affiant requests that the Court issue an order sealing this affidavit until further order of this Court.

160. I respectfully request the issuance of search warrants authorizing any federal law enforcement officer, with the assistance of other law enforcement officers, to enter and search the structure and premises on the properties described in Attachments A-1 through A-13 for items more particularly described in Attachment B.

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

Respectfully submitted,

Special Agent Alicia Ramirez
Drug Enforcement Administration

Subscribed and sworn to before me on this _____ day of July, 2017.

HONORABLE Carolyn K. Delaney
UNITED STATES MAGISTRATE JUDGE

Approved as to Form:

Roger Yang
Assistant U.S. Attorney

36

**Attachment A-1**

**7810 Elsie Avenue, Sacramento, California**





7810 Elsie Avenue, Sacramento, California, is described as a 1.26 acre parcel of land containing a peach colored single story residence, three storage shed structures and a recreational vehicle camper.  7810 Elsie Avenue is located on the south side of Elsie Avenue.  The numbers "7810" are affixed to the mail box located at the entrance of the driveway to the property.

ATTACHMENT A-2

8638 Bradshaw Road, Sacramento, California



8638 Bradshaw Road, Sacramento, California, is described as a white colored single story residence. The residence is located on the west side of Bradshaw Road at the end of a private road. A white colored sign bearing the numbers "8638" is placed at the front entrance of the property and clearly identifies, via directional arrow, the entrance to the property.

ATTACHMENT A-3

2860 Central Avenue, Roseville, California





2860 Central Avenue, Roseville, California, is described as an approximately 1.9 acre parcel of land containing a blue colored single story residence, detached garage and a workshop building. The property is located on the north side of Central Avenue. The numbers "2860" are affixed to a stone column located at the front entrance to the property.

Attachment A-4

10315 Baseline Road, Elverta, California





10315 Baseline Road, Elverta, California, is described as an approximately 2.3 acre parcel of land containing a light colored single story residence, a barn and multiple outbuildings to include sheds and a dog kennel. The property is located on the south side of Baseline Road. The numbers "10315" are affixed to a mailbox located at the end of the driveway marking the entrance to the property.

Attachment A-5

8967 Sonoma Valley Way, Sacramento, California



8967 Sonoma Valley Way, Sacramento, California, is described as a single story residence located on the east side of Sonoma Valley Way.  The exterior is comprised of tan colored stucco with peach colored trim.  The residence also contains a white colored garage door at the front of the residence.  The numbers "8967" are affixed to the front of the residence just north of the garage door.

ATTACHMENT A-6

4849 Ammolite Way, Elk Grove, California



4849 Ammolite Way, Elk Grove, California, is described as a single story, tan colored stucco residence located on the north side of Ammolite Way. The residence contains a brown colored garage door at the front of the residence. The numbers "4849" are affixed to the front of the residence just east of the garage door.

ATTACHMENT A-7

8114 Suarez Way, Elk Grove, California



8114 Suarez Way, Elk Grove, California is described as a single story residence located on the south side of Suarez Way. The exterior is comprised of tan colored stucco with stone façade. The residence also contains a cream colored garage door at the front of the residence. The numbers "8114" are affixed to the front of the residence just east of the garage door.

ATTACHMENT A-8

3433 La Cadena Way, Sacramento, California



3433 La Cadena Way, Sacramento, California, is described as a residence as a single story residence located on the north side of La Cadena Way. The exterior is comprised of tan colored stucco with brown colored trim with a clay color tile roof. The residence also contains a light cream colored garage door at the front of the residence. The numbers "3433" are affixed to the front of the residence just west of the garage door.

ATTACHMENT A-9

2725 52nd Avenue, Sacramento, California



2725 52nd Avenue, California, is described as a single story residence located on the north side of 52nd Avenue.  The exterior is comprised of cream colored stucco.  The numbers "2725" are affixed to a column at the front entrance of the residence.

**<u>Attachment A-10</u>**

**Location to be Searched**

Safe Deposit Box 810304 in the name of LIU, Yongjie, located at JP Morgan Chase, Bank branch located at 4450 Florin Road, Sacramento, California.

## Attachment A-11

### Vehicle to be Searched

A 2003 Honda Odyssey California License #7RAJ323, VIN 5FNRL185X3B133990, registered to WEI, Dao Zhong, 5656 Ehrhardt Avenue, Sacramento, California.



**Attachment A-12**

**Vehicle to be Searched**

A 2008 Infiniti bearing California License #7RAJ324, VIN JNRASO8W88X209772, registered to WEI, Dao Zhong, 5656 Ehrhardt Avenue, Sacramento, California.



## Attachment A-13

### Vehicle to be Searched

A 2013 Honda Odyssey California License #7WZA583 VIN 5FNRL5H67DB059073 registered to LIU, Yongjie, 5656 Ehrhardt Avenue, Sacramento, California.



### ATTACHMENT "B" - (Items to be seized)

Agents are authorized to search and seize property that constitutes evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses"), committed by X. P. LI and his co-conspirators:

- Title 21 U.S.C. § 841(a)(1) – Manufacture, Possess with Intent to Distribute, and Distribution of marijuana;

- Title 21 U.S.C. § 846 – Conspiracy to Manufacture and Distribute marijuana;

- Title 21 U.S.C § 856 – Maintaining a place for Manufacture and Distribution of marijuana;

- Title 18 U.S.C. § 1956(a)(2)(A) - Money Laundering;

- Title 18 U.S.C. § 1956(h)- Conspiracy to Launder Money; and

- Title 18 U.S.C. § 1957 – Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity.

Specifically, the specific evidence, fruits, and instrumentalities of the Target Offenses for which agents may search and seize are:

A. Marijuana in various forms, to include: living plants, harvested plants and stalks, dried or drying plants, and processed marijuana.

B. Marijuana seeds and/or marijuana plant clones.

C. Any other controlled substances and/or contraband during service of this warrant.

D. Equipment and tools used for the cultivation, storage, or processing of marijuana, including, but not limited to:

    1) Irrigation devices, garden hoses, water buckets, five gallon buckets, electronic timing devices, electronic watering devices, aerators, PVC pipe, water storage drums, water tanks, hose filter fittings, valves, water pumps, lights, timers, power packs, power cords, extension cords, generators, air conditioning units, fans, heat pumps, shovels, rakes, brush clearing equipment, handsaws, pruning shears, hand held sprayers, in line fertilizer/water tanks, herbicides, starter pots, planter pots, grow pots, alligator clips, zip-lock bags, rolling paper, cigarette packs, small medicine containers, glass and plastic vials, rolled up papers for holding seeds, sifters, digital scales and other weighing devices, drying screens, paper bags, pouches, backpacks, burlap bags, plastic storage containers;

2)    Books and/or magazines for growing marijuana, such as: High Times, Marijuana Growers Guides, Sinsemillia Tips, Marijuana Potency, Marijuana Botany, Marijuana, and other marijuana publications;

E.    United States currency over $2,000.

F.    Narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notation logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed.

G.    Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

H.    Bank account records, wire transfer records, bank statements and records, money drafts, letters of credit, safety deposit keys and records, money wrappers, money containers, income tax returns, and records of financial transfers which reflect the money generated from the sale of narcotics in violation of 21 U.S.C. §§ 841 and 846.

I.    Any and all log-in records, sign-up sheets, and records or logs kept that demonstrate the persons authorized to access the safe deposits boxes identified in **Attachment A-10** when the safe deposit boxes and/or associated accounts were accessed, and who initiated the creation of the safe deposit boxes;

J.    Telephone paging devices, beepers, mobile phones (including the contents thereof including the phone number of the device, the listing of most recent calls, the directory of names and phone numbers, saved text messages, stored emails, and saved photographs and/or video clips (which includes saved photographs and/or video clips having to do with marijuana sales and/or marijuana production or persons associated with the marijuana sales and/or production), car phones, answering machines and tapes, and other communication devices which could be used to participate in a conspiracy to distribute controlled substances in violation of 21 U.S.C. §§ 841 and 846 and/or 843(b).

K.    Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in narcotic trafficking activities.

L.    Items evidencing the receipt of income from any source including Forms W 2, 1098 and 1099, Federal and state income tax records and work papers, employment records, pay stubs, social security statements, business receipts, business books and records, journals and ledgers, receipts, invoices, sales of assets, real estate sale and purchase records, escrow records, bank records (including foreign accounts and related transactions), brokerage records, investment account statements, stock certificates, receipts documenting purchase and sale of stocks, contracts, purchase orders, estate records, loan records, letters of credit, notes payable and receivable,

IOU's and other recordings of debts comprising evidence of loans and expenses, checks, passbooks and deposit receipts, check registers and checkbooks, insurance documents, money orders, cashier's checks, bank drafts, wire transfers, and money drafts.

M.   Items evidencing the obtaining, transfer, and/or concealment of assets and the obtaining, transfer, concealment and/or expenditure of money to include business books and records, invoices, receipts, records of real estate or securities transactions, escrow files, vehicle and vessel purchase records, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, checkbooks, loan statements, work papers, and records reflecting the purchase of assets.

N.   Items relating to loans and the obtaining of funds from lending institutions or private parties including loan applications, credit reports, Verification of Deposit (VOD) forms, verification of rental status documents, correspondence to or from lending institutions, occupancy documents, verification of employment documents, accountant verification documents, and income verification documents.

O.   Items evidencing any landlord tenant or leaser leaseholder relationship including rental or lease applications, "walk through" documents, receipt books, rental ledgers, property descriptions, documents relating to rental income and expenses, landlord books, correspondence, credit reports, eviction records.

P.   Copies of any Currency Transaction Reports (CTRs), bank notification requirements for CTRs, schedules of currency activities, money orders, cashier checks, and wire transfers.

Q.   Photographs, negatives, video tapes, films, undeveloped film and the contents therein, and slides depicting the subjects of the investigation and their criminal associates, their assets and/or controlled dangerous substances.

R.   Items tending to identify the location where controlled substances and other evidence of narcotics trafficking may be found, to include records and keys for vehicles, storage facilities, residences, businesses, post office boxes, safe deposit boxes, and safes.

S.   Items tending to establish the identity of persons in control of the premises being searched, to include rent receipts, utility bills, check books, bank account records, addressed envelopes, passports, residence keys, vehicle registrations, videos, exposed film and photographs.

T.   Items tending to establish evidence of money laundering activity to include records of currency transactions, foreign and domestic financial transactions, such as wire transfers, cashier's checks and money orders, bank drafts, and published reference material on the subject of money laundering. In addition, customer lists, supplier lists, correspondence, notation logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when goods believed to be used in the cultivation of marijuana, were purchased, possessed,

transferred, distributed, sold or concealed in whatever form (handwritten, digital, saved on computer, etc.).

U.    Records, items, and documents reflecting travel for the purpose of participating in narcotics trafficking, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to locations.

V.    Handguns, shotguns, rifles, explosives, and other firearms/incendiary devices and ammunition that may be used to facilitate the possession and/or distribution of controlled substances.

W.    Surveillance equipment to help protect their marijuana dispensary operations and for counter surveillance against law enforcement, including, but not limited to, surveillance cameras and monitors, anti-bugging devices, and devices used to detect the presence of wiretaps, recording devices, transmitters, and/or receipts or literature describing the same.

X.    Items records tending to show employment and/or wages.

Y.    Records showing the purchase, sale, lease, rental, installment sale of equipment that could be used to facilitate indoor marijuana cultivation; including, but not limited to, business records showing expenditures and receipts.

Z.    **Digital evidence as described below:**

1)    Computers, software, peripheral data storage devices, that may contain the items listed in this attachment items (records), and all other equipment/material/programs needed to review the contents of the computer (with law enforcement allowed to take the computer and related material for off-site inspection and allowed 120 days from the day of the search to examine the content of computer and related equipment to determine whether it contains items to be seized – unless extended by order of court).

2)    Any computer equipment or digital devices used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners that are capable of being used to commit or further the crimes referenced above, or to create, access, process, or store evidence, contraband, fruits, or instrumentalities of such crimes;

3)    Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and cell phones capable of being used to commit or further the crimes referenced above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes;

4)   Any documentation, operating logs, and reference manuals regarding the operation of the computer equipment, storage devices, or software;

5)   Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

6)   Any physical keys, encryption devices, dongles, or similar physical items which are necessary to gain access to the computer equipment, storage devices, or data;

7)   Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices, or data; and

8)   All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show the actual user(s) or owners of the computers or digital devices during the time the device was utilized to commit the crimes referenced above, including the web browser's history; temporary Internet files; cookies, bookmarked, or favorite web pages; email addresses used from the computer; MAC IDs and/or Internet Protocol addresses used by the computer; email, instant messages, and other electronic communications; address books; contact lists; records of social networking and online service usage; and software that would allow others to control the digital device such as viruses, Trojan horses, and other forms of malicious software (or alternatively, the lack of software that would allow others to control the digital device).

9)   All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer or digital device.

10)  All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show contextual information necessary to understand the evidence, contraband, fruits, or instrumentalities described in this attachment.

11)  All evidence called for in other portions of this attachment that might be stored, created, recorded, or maintained in digital format.

# UNITED STATES DISTRICT COURT

for the

• Eastern District of California

In the Matter of the Search of )
)
)
2860 Central Avenue, Roseville, California )   Case No. 2: 17 - SW - 0 6 6 0   **CKD**
)
)

SEALED

## SEARCH AND SEIZURE WARRANT

To:   Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the _____ Eastern _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A-3, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before   8/7/2017   *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to: any authorized U.S. Magistrate Judge in the Eastern
District of California.

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   7/24/2017   1:12pm   _Carolyn Delaney_
_____
*Judge's signature*

City and state:   Sacramento, California   _____   Carolyn K. Delaney, U.S. Magistrate Judge
_____
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____          _____
                Signature of Judge                                   Date

ATTACHMENT A-3

2860 Central Avenue, Roseville, California





2860 Central Avenue, Roseville, California, is described as an approximately 1.9 acre parcel of land containing a blue colored single story residence, detached garage and a workshop building. The property is located on the north side of Central Avenue. The numbers "2860" are affixed to a stone column located at the front entrance to the property.

**ATTACHMENT "B" - (Items to be seized)**

Agents are authorized to search and seize property that constitutes evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses"), committed by X. P. LI and his co-conspirators:

-   Title 21 U.S.C. § 841(a)(1) – Manufacture, Possess with Intent to Distribute, and Distribution of marijuana;

-   Title 21 U.S.C. § 846 – Conspiracy to Manufacture and Distribute marijuana;

-   Title 21 U.S.C § 856 – Maintaining a place for Manufacture and Distribution of marijuana;

-      Title 18 U.S.C. § 1956(a)(2)(A) - Money Laundering;

-      Title 18 U.S.C. § 1956(h)- Conspiracy to Launder Money; and

-   Title 18 U.S.C. § 1957 – Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity.

Specifically, the specific evidence, fruits, and instrumentalities of the Target Offenses for which agents may search and seize are:

A.   Marijuana in various forms, to include: living plants, harvested plants and stalks, dried or drying plants, and processed marijuana.

B.   Marijuana seeds and/or marijuana plant clones.

C.   Any other controlled substances and/or contraband during service of this warrant.

D.   Equipment and tools used for the cultivation, storage, or processing of marijuana, including, but not limited to:

   1)   Irrigation devices, garden hoses, water buckets, five gallon buckets, electronic timing devices, electronic watering devices, aerators, PVC pipe, water storage drums, water tanks, hose filter fittings, valves, water pumps, lights, timers, power packs, power cords, extension cords, generators, air conditioning units, fans, heat pumps, shovels, rakes, brush clearing equipment, handsaws, pruning shears, hand held sprayers, in line fertilizer/water tanks, herbicides, starter pots, planter pots, grow pots, alligator clips, zip-lock bags, rolling paper, cigarette packs, small medicine containers, glass and plastic vials, rolled up papers for holding seeds, sifters, digital scales and other weighing devices, drying screens, paper bags, pouches, backpacks, burlap bags, plastic storage containers;

2)      Books and/or magazines for growing marijuana, such as: High Times, Marijuana Growers Guides, Sinsemillia Tips, Marijuana Potency, Marijuana Botany, Marijuana, and other marijuana publications;

E.   United States currency over $2,000.

F.   Narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notation logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed.

G.   Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

H.   Bank account records, wire transfer records, bank statements and records, money drafts, letters of credit, safety deposit keys and records, money wrappers, money containers, income tax returns, and records of financial transfers which reflect the money generated from the sale of narcotics in violation of 21 U.S.C. §§ 841 and 846.

I.   Any and all log-in records, sign-up sheets, and records or logs kept that demonstrate the persons authorized to access the safe deposits boxes identified in **Attachment A-10** when the safe deposit boxes and/or associated accounts were accessed, and who initiated the creation of the safe deposit boxes;

J.   Telephone paging devices, beepers, mobile phones (including the contents thereof including the phone number of the device, the listing of most recent calls, the directory of names and phone numbers, saved text messages, stored emails, and saved photographs and/or video clips (which includes saved photographs and/or video clips having to do with marijuana sales and/or marijuana production or persons associated with the marijuana sales and/or production), car phones, answering machines and tapes, and other communication devices which could be used to participate in a conspiracy to distribute controlled substances in violation of 21 U.S.C. §§ 841 and 846 and/or 843(b).

K.   Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in narcotic trafficking activities.

L.   Items evidencing the receipt of income from any source including Forms W 2, 1098 and 1099, Federal and state income tax records and work papers, employment records, pay stubs, social security statements, business receipts, business books and records, journals and ledgers, receipts, invoices, sales of assets, real estate sale and purchase records, escrow records, bank records (including foreign accounts and related transactions), brokerage records, investment account statements, stock certificates, receipts documenting purchase and sale of stocks, contracts, purchase orders, estate records, loan records, letters of credit, notes payable and receivable,

IOU's and other recordings of debts comprising evidence of loans and expenses, checks, passbooks and deposit receipts, check registers and checkbooks, insurance documents, money orders, cashier's checks, bank drafts, wire transfers, and money drafts.

M.   Items evidencing the obtaining, transfer, and/or concealment of assets and the obtaining, transfer, concealment and/or expenditure of money to include business books and records, invoices, receipts, records of real estate or securities transactions, escrow files, vehicle and vessel purchase records, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, checkbooks, loan statements, work papers, and records reflecting the purchase of assets.

N.   Items relating to loans and the obtaining of funds from lending institutions or private parties including loan applications, credit reports, Verification of Deposit (VOD) forms, verification of rental status documents, correspondence to or from lending institutions, occupancy documents, verification of employment documents, accountant verification documents, and income verification documents.

O.   Items evidencing any landlord tenant or leaser leaseholder relationship including rental or lease applications, "walk through" documents, receipt books, rental ledgers, property descriptions, documents relating to rental income and expenses, landlord books, correspondence, credit reports, eviction records.

P.   Copies of any Currency Transaction Reports (CTRs), bank notification requirements for CTRs, schedules of currency activities, money orders, cashier checks, and wire transfers.

Q.   Photographs, negatives, video tapes, films, undeveloped film and the contents therein, and slides depicting the subjects of the investigation and their criminal associates, their assets and/or controlled dangerous substances.

R.   Items tending to identify the location where controlled substances and other evidence of narcotics trafficking may be found, to include records and keys for vehicles, storage facilities, residences, businesses, post office boxes, safe deposit boxes, and safes.

S.   Items tending to establish the identity of persons in control of the premises being searched, to include rent receipts, utility bills, check books, bank account records, addressed envelopes, passports, residence keys, vehicle registrations, videos, exposed film and photographs.

T.   Items tending to establish evidence of money laundering activity to include records of currency transactions, foreign and domestic financial transactions, such as wire transfers, cashier's checks and money orders, bank drafts, and published reference material on the subject of money laundering. In addition, customer lists, supplier lists, correspondence, notation logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when goods believed to be used in the cultivation of marijuana, were purchased, possessed,

transferred, distributed, sold or concealed in whatever form (handwritten, digital, saved on computer, etc.).

U.   Records, items, and documents reflecting travel for the purpose of participating in narcotics trafficking, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to locations.

V.   Handguns, shotguns, rifles, explosives, and other firearms/incendiary devices and ammunition that may be used to facilitate the possession and/or distribution of controlled substances.

W.   Surveillance equipment to help protect their marijuana dispensary operations and for counter surveillance against law enforcement, including, but not limited to, surveillance cameras and monitors, anti-bugging devices, and devices used to detect the presence of wiretaps, recording devices, transmitters, and/or receipts or literature describing the same.

X.   Items records tending to show employment and/or wages.

Y.   Records showing the purchase, sale, lease, rental, installment sale of equipment that could be used to facilitate indoor marijuana cultivation; including, but not limited to, business records showing expenditures and receipts.

Z.   **Digital evidence as described below:**

1)   Computers, software, peripheral data storage devices, that may contain the items listed in this attachment items (records), and all other equipment/material/programs needed to review the contents of the computer (with law enforcement allowed to take the computer and related material for off-site inspection and allowed 120 days from the day of the search to examine the content of computer and related equipment to determine whether it contains items to be seized – unless extended by order of court).

2)   Any computer equipment or digital devices used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners that are capable of being used to commit or further the crimes referenced above, or to create, access, process, or store evidence, contraband, fruits, or instrumentalities of such crimes;

3)   Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and cell phones capable of being used to commit or further the crimes referenced above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes;

4)  Any documentation, operating logs, and reference manuals regarding the operation of the computer equipment, storage devices, or software;

5)  Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

6)  Any physical keys, encryption devices, dongles, or similar physical items which are necessary to gain access to the computer equipment, storage devices, or data;

7)  Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices, or data; and

8)  All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show the actual user(s) or owners of the computers or digital devices during the time the device was utilized to commit the crimes referenced above, including the web browser's history; temporary Internet files; cookies, bookmarked, or favorite web pages; email addresses used from the computer; MAC IDs and/or Internet Protocol addresses used by the computer; email, instant messages, and other electronic communications; address books; contact lists; records of social networking and online service usage; and software that would allow others to control the digital device such as viruses, Trojan horses, and other forms of malicious software (or alternatively, the lack of software that would allow others to control the digital device).

9)  All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer or digital device.

10)  All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show contextual information necessary to understand the evidence, contraband, fruits, or instrumentalities described in this attachment.

11)  All evidence called for in other portions of this attachment that might be stored, created, recorded, or maintained in digital format.